756 F.2d 1197
 Robert B. PERRY and Linda T. Perry, Plaintiffs-Appellants,
Cross-Appellees,
v.
STEWART TITLE CO., et al., Defendants-Appellees,
Federal National Mortgage Association, Defendant-Appellee,
Cross-Appellant.
Hammond Mortgage Corp., Defendant-Appellee, Cross-Appellant.
 No. 83-2552.
 United States Court of Appeals,
Fifth Circuit.
 April 8, 1985.
Rehearing Denied May 28, 1985.
 
 Schleider & Francis, Paul S. Francis, Houston, Tex., for plaintiffs-appellants, cross-appellees.
 DeLange, Hudspeth, Pitman & Katz, Charles E. Fitch, Ben A. Baring, Houston, Tex., for Stewart Title Co., Stewart Guaranty & D. Walters.
 David C. DuBose, Houston, Tex., for Hammond Mortg. Corp.
 Locke, Purnell, Boren, Laney & Neely, Nathan L. Hecht, Harriet Miers, Robert M. Candee, Dallas, Tex., Morris, McCanne, Tinsley, Snowden, Ellis & Wilson, Paul R. Tinsley, Houston, Tex., for Federal Nat. Mortg. Assn.
 Crain, Caton, James & Womble, Thomas B. Greene, III, Houston, Tex., for Greiner, Greiner Const. Co.
 G. Alan Kramer, Dale C. Scott, Houston, Tex., for Friendswood Development Co.
 Appeals from the United States District Court for the Southern District of Texas.
 Before CLARK, Chief Judge, JOHNSON and WILLIAMS, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 The creative efforts of plaintiff Robert Perry, a lawyer, and the intransigence of ten defendants turned this relatively simple breach of contract/tort case involving the sale of a residence into a enormously expensive brouhaha for all of the parties. Robert and Linda Perry purchased a $70,000 home and learned that part of their driveway and garage encroached upon an underground utility easement. They sought to rescind their earnest money contract and to that end instituted suit and asserted seventy-six claims against ten defendants. The defendants eventually secured a release of liability for the encroachment at a cost of $100, but the Perrys continued their suit. The parties have collectively spent approximately $500,000 in legal fees prosecuting and defending this suit.
 
 
 2
 In this appeal, the Perrys challenge a variety of the district court's rulings at the trial. At the close of the evidence after the ten-day jury trial, the district court granted several motions for directed verdicts. The remaining issues were submitted to the jury, and the jury returned a substantial verdict for the Perrys. The district court, however, granted three of the defendants' motions for judgments non obstante veredicto, and those rulings defeated the jury's award to the Perrys. The Perrys challenge the district court's rulings on the defendants' motions for directed verdicts and for judgments n.o.v. and additionally argue that the district court erroneously denied three of their motions for judgments n.o.v. We find all of the district court's rulings correct except for rulings on two closely related and narrow issues.
 
 I.
 
 3
 In 1976, Friendswood Development Company (Friendswood), a real estate developer, deeded to Houston Lighting & Power Co. (HL & P) a five-foot wide "across, under, and over" utility easement for street lighting in a subdivision that Friendswood was developing. Friendswood recorded the HL & P easement on a comprehensive subdivision plat which was filed with the Harris County, Texas, recorder of deeds. In early 1977, Friendswood sold a parcel of land which the easement crossed to Greiner Construction Co. (Greiner), and in connection with that transaction provided Greiner with a copy of the subdivision plat. The general warranty deed Friendswood supplied Greiner clearly stated that Greiner accepted the property subject to all recorded easements.
 
 
 4
 Later in the same year, Greiner constructed a single family residence on the property. Prior to Greiner's pouring the concrete foundation for the home, Friendswood inspected the wooden foundation forms and approved their dimensions. The garage foundation and part of the driveway actually encroached approximately one foot onto the easement. After Greiner poured the foundation and driveway, HL & P installed underground an electrical conduit, with a diameter of two inches, at a depth of thirty inches and approximately two feet parallel to the foundation and driveway.
 
 
 5
 In May 1978, the Perrys inspected the home constructed by Greiner and decided to purchase it. The Perrys and Greiner entered into an earnest money contract to purchase the $70,000 home, and they paid earnest money in the amount of $1,000 to Stewart Title Co. (Stewart), the escrow agent. Hammond Mortgage Co. (Hammond) was to provide the financing.
 
 
 6
 The closing of the sales transaction was held on July 5, 1978, at Stewart's office. The Perrys, their real estate agent, and Debra Walters Rod (Rod), Stewart's escrow officer, were present at the closing. Rod supervised the closing of both the residence sale transaction between Greiner and the Perrys and the loan from Hammond to the Perrys. At the completion of the closing, Greiner provided the Perrys with a general warranty deed for the property.
 
 
 7
 The Perrys had no contractual agreement with Greiner, Hammond, Stewart, or any other party to be furnished with a copy of any land survey prior to the closing. For its own protection, however, Hammond had informed Stewart that it would require Stewart to obtain and furnish to it a copy of a survey before Hammond would provide financing for the transaction. A copy of the survey was not available at the closing, although all of the parties went forward with the closing. At trial, Robert Perry testified that he asked Rod at the closing whether a survey had been conducted and, if so, whether it revealed any problems. According to Perry, Rod replied that a survey had been conducted, that it revealed no problems, and that a copy of the survey would be available shortly. Rod did not dispute this testimony at trial.
 
 
 8
 On July 6, 1978, the day after the closing, the survey was delivered to Stewart, and it revealed that the Perrys' garage and driveway encroached approximately one foot onto HL & P's easement. Stewart, through its title insurance issuing agent, Stewart Title Guaranty Co. (STG), issued an owner's title policy dated July 6, 1978, to the Perrys which excepted from coverage the one-foot encroachment. The Perrys received this policy on July 12, 1978, and they immediately objected to the easement exception. In response to the objection, five days later Stewart issued a new policy which did not contain any exclusions from coverage as a result of the encroachment. Pursuant to the coverage afforded under the new title policy, the Perrys then demanded Stewart or STG to take steps necessary to cure the encroachment.
 
 
 9
 In mid-July 1978, Stewart wrote to HL & P and sought to arrange a waiver of the easement. On August 16, 1978, Stewart delivered to the Perrys for their approval a "Consent to Encroachment" that Stewart had received from HL & P regarding the encroachment. HL & P routinely provided consents to encroachments to remedy residential encroachments, such as the Perrys', on its easements. The consent stated that HL & P would not enforce its easement rights against the Perrys unless absolutely necessary. The day after the Perrys received the consent to encroachment they informed Stewart that the consent was an unacceptable method of curing the encroachment. Thereafter, STG sought to obtain from HL & P a full release of any claim held by HL & P for the one-foot encroachment. After discussing the matter with HL & P representatives, the claims counsel of STG by a letter dated August 24, 1978, informed the Perrys that HL & P appeared amenable to executing a full release but that it would take about six weeks to obtain the release.
 
 
 10
 In the meantime, on August 15, 1978, the Federal National Mortgage Association ( FNMA ) had purchased the Perrys loan from Hammond, although Hammond continued to service the loan for FNMA. On or about August 25, after the Perrys received STG's letter of August 24, the Perrys gave notice to all of the parties, except FNMA, that they intended to rescind the earnest money contract if no release was obtained from HL & P by October 9, 1978. No release was obtained by October 9, and the Perrys notified STG that they rescinded the transaction which had closed on July 5, 1978. On October 21, 1978, the Perrys voluntarily vacated the residence. The Perrys made no additional mortgage payments after that date, demanded that Greiner, Hammond, and Stewart refund their purchase money and payments to that date, and canceled their homeowner's insurance policy on the property.
 
 
 11
 On December 1, 1978, the Perrys filed suit in state court against Friendswood, Greiner, Hammond, Stewart, STG, Rod, and three other defendants. In that suit, the Perrys asserted nearly seventy claims against these nine defendants for the following: breach of contract, breach of warranty, statutory and common law fraud, negligence, deceptive trade practices, usury, loan disclosure violations, violations of state and federal truth in lending and debt collection acts, and violations of related federal and state acts. On December 12, 1978, two weeks after the Perrys filed their suit, HL & P executed a complete release of all rights to that portion of the easement upon which the Perrys' garage and driveway encroached. The cost of securing this release was $100, and Stewart paid the fee.
 
 
 12
 In mid-1980, FNMA threatened to foreclose on the subject property, and on July 28, 1980, the Perrys brought FNMA into the state suit as a party-defendant. The Perrys asserted that FNMA was liable under an agency theory for the allegedly wrongful acts of Hammond. FNMA removed the case to the United States District Court for the Southern District of Texas.
 
 
 13
 The case was tried by a jury. At trial, the Perrys insisted that the encroachment of their garage and driveway onto HL & P's easement enabled HL & P to compel the Perrys to destroy their garage and remove their driveway. They also claimed that the consent to encroachment executed by HL & P gave HL & P the right to tear down the Perrys' garage at the Perrys' expense if the need arose. The HL & P manager of the department responsible for preparing and approving consents to encroachments and full releases of HL & P's easement rights testified that encroachments onto HL & P's easements were common but minor problems and that in his 31 years of employment with HL & P he had never known of any case where HL & P demolished or forced the owner to demolish a structure because it encroached upon an HL & P easement. The witness also testified that he had informed Mr. Perry that a full release was imminent but that it would take longer than expected. Robert Perry conceded at trial that HL & P representatives told him that HL & P had never destroyed a structure because it encroached on one of HL & P's easements. Other undisputed testimony at trial revealed that the encroachment of the Perrys' garage onto the HL & P easement affected neither the marketability nor the value of the property. Stated simply, there was more than substantial evidence showing that the encroachment was de minimis.
 
 
 14
 At the close of the evidence, all of the defendants moved for directed verdicts on all of the claims asserted against each of them. The Perrys moved for a directed verdict only with respect to Hammond's and FNMA's counterclaims for attorney's fees. The district court granted defendants FNMA's, STG's, Paul Forester Properties', Wyatt Construction Co.'s, and Friendswood Development Co.'s motions for directed verdicts, finding a complete absence of evidence that properly could support a verdict as to any of these defendants. The district court granted parts of Hammond's and Greiner's motions for directed verdicts but submitted the remaining claims to the jury. All of the claims concerning the liability of Stewart and Rod were submitted to the jury.
 
 
 15
 In response to the special interrogatories, the jury found:
 
 
 16
 (1) Greiner was negligent in constructing the Perrys' house on an easement, and this negligence damaged the Perrys;
 
 
 17
 (2) Greiner's negligence was the result of bona fide error;
 
 
 18
 (3) the statements made by Rod and Stewart about the missing land survey were negligently made, and this negligence damaged the Perrys;
 
 
 19
 (4) the statements made by Rod and Stewart regarding the land survey were not fraudulent;
 
 
 20
 (5) Stewart's statements and actions concerning the land survey were false, misleading, or deceptive, and this conduct damaged the Perrys;
 
 
 21
 (6) the Perrys allowed Greiner and Stewart a reasonable time to cure the encroachment problem before initiating suit;
 
 
 22
 (7) Hammond's failure to include the address of the house and to state all prepayment charges on the loan disclosure statement was the result of a bona fide error.
 
 
 23
 The jury awarded damages to the Perrys in the following amounts: $16,780.35 for Greiner's negligent construction; $1,000.00 for Greiner's failure to convey clear title; $17,780.35 for Rod's and/or Stewart's negligent statements at the closing; $30,000.00 for Stewart's false, misleading, or deceptive acts; and $45,000.00 for attorney's fees.
 
 
 24
 Stewart, Rod, and Greiner each moved for judgments n.o.v. on each of the claims decided adversely to them. The Perrys moved for judgments n.o.v. on the "bona fide" findings by the jury. On August 10, 1983, the district court granted Stewart's, Rod's, and Greiner's motions, finding that the Perrys were not damaged as a result of these defendants' actions. Specifically, the district court found that (1) the Perrys' damages were neither foreseeable nor causally related to Stewart's, Rod's, or Greiner's actions; (2) even if the damages were foreseeable and causally related, the Perrys were not entitled to recover any money, since they had failed to present competent evidence concerning the proper measure of damages; and (3) alternatively, the plaintiffs failed to mitigate their damages. The district court held that the proper measure of damages in tort for injury to real property and in contract for breach of warranty is either the difference in the property's value with or without the defect or the cost to cure the defect. The court concluded that the Perrys presented no evidence concerning the property's diminution in value and that the defendants had paid all of the costs incident to obtaining the full release from HL & P. The district court also denied the Perrys' motions for judgments n.o.v. on the bona fide error findings.
 
 
 25
 Consistent with their seeming attempt in the district court to overwhelm with the sheer number of their claims, the Perrys in this appeal raise numerous challenges to the district court's rulings.
 
 II.
 
 26
 A. The Perrys' Right to Rescind the Contract
 
 
 27
 The critical issue in this appeal is whether the district court correctly granted Greiner's, Stewart's, and Rod's motions for judgments n.o.v., overturning the jury's findings of liability and damages. After examining the jury's responses to the special interrogatories, the district court concluded in effect that the damages the jury found the Perrys had sustained grew out of the attempt to rescind the contract. The district court's decision does not accept the assertion that there was a valid rescission. The court further concluded that the Perrys were entitled to sue for damages for either breach of warranty or negligence, but that they failed to offer any evidence concerning the proper measure of damages for either cause of action. We agree with these findings and conclusions of the district court.
 
 
 28
 Throughout this proceeding the Perrys based their right to rescind on a provision of the earnest money contract between themselves and Greiner. They assert that this provision authorized them to assert any objection to the title insurance policy upon receipt of that policy and to demand that Greiner cure any objections they raised. The general warranty deed the Perrys received and accepted at the closing contained no similar provision.
 
 
 29
 In Texas, as in most other jurisdictions, in the absence of fraud, accident, or mutual mistake, the rights and duties created by a land sales contract are merged into the deed when the seller delivers and the buyer accepts the deed. See Commercial Bank, Unincorporated v. Satterwhite, 413 S.W.2d 905, 909 (Tex.1967); Barker v. Coastal Builders, Inc., 153 Tex. 540, 271 S.W.2d 798, 803 (1954); Tuberville v. Upper Valley Farms, Inc., 616 S.W.2d 676, 678 (Tex.Civ.App.--Corpus Christi 1981, no writ); Duke v. Duke, 605 S.W.2d 408, 410 (Tex.Civ.App.--El Paso 1980, no writ); Carter v. Barclay, 476 S.W.2d 909, 914 (Tex.Civ.App.--Amarillo 1972, no writ); Baker v. Baker, 207 S.W.2d 244, 250 (Tex.Civ.App.--San Antonio 1947, writ ref'd n.r.e.); see also 6A R. Powell & P. Rohan, Powell on Real Property p 893, at 81-112 (1984 ed.); 6A Corbin, Corbin on Contracts Sec. 1319, at 310 (1962). In this case, the Perrys assert that the merger doctrine is inoperative for two separate reasons: (1) Rod knew that the garage and driveway encroached upon the existing utility easement, but she fraudulently induced the Perrys to close on the property and to accept the deed, and (2) Rod and the Perrys had the mistaken belief that the property was free from encroachments.
 
 
 30
 The Perrys properly raised the fraud argument to the jury, but the jury rejected the claim. In response to the special interrogatories, the jury found that Rod's statements at the closing were "negligently made" but not "fraudulent"; they were "false, misleading, or deceptive acts." (emphasis added). As an appellate court, our duty is to reconcile the jury's responses to the special interrogatories as consistent, if that is possible. Crossland v. Canteen Corp., 711 F.2d 714, 725 (5th Cir.1983). We view the jury's responses in this case as consistent--the jury found that Rod's statements were "false" (that is--untrue), but were not fraudulent. The Perrys therefore failed to prove fraud, and the merger doctrine cannot be avoided on that ground.
 
 
 31
 The Perrys remaining ground fails for different reasons. To vitiate the merger doctrine on the basis of mutual mistake, the party seeking to avoid the doctrine must show that both parties had the same misunderstanding about the same material fact. Tuberville v. Upper Valley Farms, supra, 616 S.W.2d at 678; see also A.L.G. Enterprises, Inc. v. Huffman, 660 S.W.2d 603, 606 (Tex.Civ.App.--Corpus Christi 1983), aff'd in relevant part, 672 S.W.2d 230 (Tex.1984). A mutual mistake is material if it involves the substance or subject matter of the contract and is not related merely to a collateral matter. Horner v. Bourland, 724 F.2d 1142, 1145 (5th Cir.1984); Durham v. Uvalde Rock Asphalt Co., 599 S.W.2d 866, 870 (Tex.Civ.App.--San Antonio 1980, no writ); Brown McKee, Inc. v. Western Beef, Inc., 538 S.W.2d 840, 845 (Tex.Civ.App.--Amarillo 1976, writ ref'd n.r.e.).
 
 
 32
 In this case, the Perrys never asked the court to submit a special interrogatory permitting the jury to determine whether Rod's and the Perrys' understanding of the land survey generally, and the lack of any encroachment specifically, constituted a mutual mistake of a material fact. In any event, we find that the record could not support such a conclusion, since the alleged mutual misunderstanding did not affect a material aspect of the contract.
 
 
 33
 The overwhelming evidence adduced at trial revealed: (1) that encroachments upon utility easements, such as the Perrys', were common problems faced by landowners and HL & P; (2) that HL & P routinely granted consents or complete releases in such cases; (3) that within one month after the Perrys asserted their objection, Stewart presented them with HL & P's consent to encroachment; (4) that the Perrys were assured repeatedly that the problem would be resolved; (5) that HL & P had never destroyed structures because those structures encroached onto one of its easements; (6) that the electrical conduit in the HL & P easement adjacent to the Perrys' property was two feet from the Perrys' foundation, and there was no likelihood that the Perrys' property ever would be disturbed as a result of the encroachment onto this easement; (7) that the encroachment affected neither the marketability nor the value of the Perrys' home; and (8) that Stewart, at a cost of only $100, eventually secured from HL & P a complete waiver of HL & P's rights to that portion of the easement on which the Perrys' garage and driveway encroached. These facts convince us that alleged misunderstanding concerning the land survey simply did not relate to a material aspect of the bargain and, at best, concerned merely a collateral matter. As such, there could be no rescission based on either the fraud or the mutual mistake theories.
 
 
 34
 Since the land sales contract merged into the deed, the Perrys lacked the right to rescind. Instead, they were entitled to sue only for damages for Greiner's breach of warranty or negligence in failing to convey clear title. Bristow v. City Investment Co., 110 S.W.2d 1222, 1224 (Tex.Civ.App.--Galveston 1937, writ dis'd); Luckenbach v. Thomas, 166 S.W. 99, 103 (Tex.Civ.App.--San Antonio 1914, no writ). The proper measure of damages in such a case is either the difference in the property's value with and without the defect, Moren v. Pruske, 570 S.W.2d 442, 444 (Tex.Civ.App.--San Antonio 1978, writ ref'd n.r.e.), or the cost to remedy the defect, Turner, Collie & Braden, Inc. v. Brookhollow, Inc., 642 S.W.2d 160, 164 (Tex.1982).
 
 
 35
 At trial, the Perrys sought to recover for the expenses incident to their attempted rescission--their house hunting expenses, the cost of moving from their house, the cost of renting an apartment after they moved, the loss of favorable financing and depreciation on the house, closing costs, and house payments made to Hammond. Since the Perrys lacked the right to rescind, these damages were not foreseeable, and the district court correctly granted Greiner's, Stewart's, and Rod's motions for judgments n.o.v. And because the Perrys failed to introduce evidence concerning either the diminution in the house's value or the cost of obtaining a release from HL & P, the district court also correctly concluded that the Perrys could not recover for Greiner's breach of warranty or negligence.
 
 B. Usury
 
 36
 The Perrys next claim that Hammond as the initiator of the promissory note and FNMA as the assignee of the note violated Texas usury laws since the interest on the "true" principal was greater than that permitted in Texas. The interest rate set out on the face of the promissory note was 9.629% on a principal amount of $62,300. At the time the note was executed, the maximum interest rate allowable in Texas was 10%. See Tex.Rev.Civ.Stat.Ann. art. 5069-1.02 (Vernon 1971). The note also contained a "savings clause" which provided that any charge which caused or was interpreted to cause the interest to exceed the maximum lawful rate was to be reduced to the extent necessary to eliminate the usurious violation.
 
 
 37
 The Perrys make three assertions to support their claim that the interest rate was usurious: (1) prepayments, or so-called front-end charges, totaling $1436.47, collected by Hammond, should be characterized as interest and deducted from the face amount of the note to determine "true" principal, (2) Hammond collected excessive escrow charges from the Perrys in the amount of $398.07, which also should be deducted to determine "true" principal, and (3) late charges should be characterized as interest and added to the total amount of interest the Perrys were liable to pay. None of these challenges have merit.
 
 
 38
 Texas courts have held repeatedly that front-end charges paid to the lender for initiating a loan or processing the requisite papers should be deducted from the face amount of the note to determine whether a loan is usurious. First State Bank of Bedford v. Miller, 563 S.W.2d 572, 575 (Tex.1978); Nevels v. Harris, 129 Tex. 190, 102 S.W.2d 1046, 1048 (1937). But Tex.Rev.Civ.Stat.Ann. art. 5069-1.07(a) (Vernon Supp.1985), also instructs that a loan secured by an interest in real property shall not be deemed usurious if the interest, when spread over the entire term of the loan, is within the lawful rate. See also Tanner Development Co. v. Ferguson, 561 S.W.2d 777, 781 (Tex.1977). In this case, even if $1436.47 is deducted from the stated principal amount of $62,300, the resulting interest on $60,863.53 over the 30 year term of the loan is not usurious. Hammond would have been entitled to charge the Perrys an additional $2,110.87 in interest without violating the Texas usury laws.[1]
 
 
 39
 We also reject the Perrys' claim that fees collected from them and placed in escrow for the payment of taxes and insurance premiums should be characterized as interest and deducted from the face amount of the note to arrive at "true" principal. Bona fide fees paid to parties other than the lender neither are characterized as interest nor are deductible from the principal amount. See Imperial Corporation of America v. Frenchman's Creek Corp., 453 F.2d 1338, 1343 (5th Cir.1972); Tanner Development Co. v. Ferguson, supra, 561 S.W.2d at 787; Greever v. Persky, 140 Tex. 64, 165 S.W.2d 709, 711 (1942). The deed of trust between Hammond and the Perrys specifically provided that escrow funds collected by Hammond at the closing would be paid into an insured escrow account and would be used exclusively to pay for taxes and insurance premiums. Hammond had no connection with the escrow account, and escrow funds were paid directly to the taxing authorities and the insurance company. Any overpayment into the escrow account by the Perrys merely reduced their tax and insurance liabilities in future months. Hammond received no benefit from the alleged overpayments, and the funds therefore were not properly deductible from the face amount of the loan for usury computation purposes.
 
 
 40
 Finally, we reject the claim that the late fees in the amount of 4% of the delinquent monthly installment should be characterized as interest for the purpose of determining the total interest for which the Perrys were liable. Since late charges of this nature do not involve the "use or forbearance or detention of money", see Tex.Rev.Civ.Stat.Ann. art. 5069-1.01 (Vernon 1971), and instead are merely bona fide fees paid to third parties for servicing the late payments, they are not properly characterized as "interest". See Rimco Enterprises, Inc. v. Texas Electric Service Co., 599 S.W.2d 362, 366 (Tex.Civ.App.--Fort Worth 1980, writ ref'd n.r.e.).
 
 
 41
 C. Federal Fair Debt Collection Practices Act and Texas Debt Collection Act Claims
 
 
 42
 The Perrys claim that the trial court erred in granting Hammond's and FNMA's motions for directed verdicts on their claims under the Federal Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. Sec. 1692 (1982), and the Texas Debt Collection Act (TDCA), Tex.Rev.Civ.Stat.Ann. arts. 5069-11.01 to 5069-11.11 (Vernon Supp.1985).
 
 
 43
 The FDCPA makes it unlawful for debt collectors to use abusive tactics while collecting debts for others. The FDCPA defines a debt collector as "any person ... who regularly collects or attempts to collect ... debts owed or due or asserted to be owed or due another." 15 U.S.C. Sec. 1692a(6). The term "debt collector" does not include:
 
 
 44
 [A]ny person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity ... (ii) concerns a debt which was originated by such person [or] (iii) concerns a debt which was not in default at the time it was obtained by such person.
 
 
 45
 15 U.S.C. Sec. 1692a(6)(G). The legislative history of section 1692a(6) indicates conclusively that a debt collector does not include the consumer's creditors, a mortgage servicing company, or an assignee of a debt, as long as the debt was not in default at the time it was assigned. See S.Rep. No. 95-382, 95th Cong., 1st Sess. 3, reprinted in 1977 U.S.Code Cong. & Ad.News 1695, 1698. See also Kizer v. Finance America Credit Corp., 454 F.Supp. 937, 939 (N.D.Miss.1978). In this case, the FDCPA is inapplicable, since neither Hammond nor FNMA is a debt collector. Hammond sold the Perry loan to FNMA approximately 1 1/2 months after the closing and approximately 2 months before the Perrys were in default. After Hammond sold the loan, it continued to service the loan for FNMA. Thus, FNMA was a bona fide assignee of a debt, and Hammond was a bona fide mortgage servicing company. The district court correctly granted Hammond's and FNMA's motions for directed verdicts on this claim.
 
 
 46
 The Perrys also argue that the district court improperly granted Hammond's and FNMA's motions for directed verdicts for the alleged violations of the TDCA. As an initial matter, there is no dispute that Hammond and FNMA fall within the broader definition of a debt collector under the TDCA. See Tex.Rev.Civ.Stat.Ann. art. 5069-11.01(c) (" 'Debt collector' means any person engaging directly or indirectly in debt collection"). Article 5069-11.03 makes it unlawful for an unidentified debt collector using a telephone to call the debtor "with the willful intent to annoy or harass or threaten any person at the called number." At trial, Mr. Perry testified that on or about November 28, 1978, he received a phone call from an unidentified caller who in an abusive manner demanded payment of the alleged indebtedness the Perrys owed Hammond.
 
 
 47
 Hammond answers that no evidence was introduced at trial which established that Hammond actually placed this call, and therefore the directed verdict was properly granted. Alternatively, Hammond claims that even if one of its agents or employees placed the call, there was no evidence that the caller possessed the willful intent "to annoy or harass or threaten" the Perrys or that the Perrys sustained any injury as a result of this phone call.
 
 
 48
 Although there may have been no direct evidence establishing Hammond's involvement in the offensive phone call, Mr. Perry's testimony was circumstantial and raised a question of fact for the jury. The necessary credibility choice was one uniquely reserved for the jury. Taken to its logical conclusion, Hammond's argument would defeat the clear purpose of the TDCA, since an unidentified debt collector could phone the debtor, communicate to the debtor "pay up, or else!" threats, and insist at trial that the TDCA is inapplicable as a matter of law. Hammond's claim that the caller acted without the willful intent "to annoy or harass or threaten" also is a jury question, given the nature and timing of the alleged communication in question. Finally, there is sufficient record evidence from which a jury could have concluded that the Perrys suffered damages from this phone call. See Ledisco Financial Services, Inc. v. Viracola, 533 S.W.2d 951, 957 (Tex.Civ.App.--Texarkana 1976, no writ) (consumer may recover damages for mental anguish under the TDCA). The district court improperly granted the motions of Hammond and FNMA for directed verdicts on the TDCA claim.
 
 
 49
 D. Breach of Warranty Claims Against Friendswood
 
 
 50
 The Perrys assert that the district court improperly granted Friendswood's motion for a directed verdict on their breach of warranty claims against Friendswood. The Perrys argue that Friendswood breached two warranties: a warranty of title and an express warranty. Friendswood was the original developer of the property upon which the Perrys' home was constructed. In 1977, Friendswood conveyed the subject lot to Greiner, and the deed was placed in escrow with Stewart until Greiner paid the outstanding balance of the loan for the lot. Greiner poured the concrete slab for the home after it purchased the lot from Friendswood but before it paid the balance of the note to Stewart.
 
 
 51
 In their warranty of title claim, the Perrys do not argue that Friendswood breached any warranty by conveying the easement to HL & P in the first instance. Indeed, no such attack could be made, since Friendswood (1) diligently recorded the easement on a comprehensive subdivision plat, (2) filed that plat with the recorder of deeds, (3) provided copies of that plat to Greiner, and (4) indicated in its deed to Greiner that Greiner accepted the property subject to all recorded easements. Rather, the Perrys claim that Friendswood breached a warranty of title because Friendswood allegedly was the owner of the property at the time Greiner created the encroachment by pouring the foundation over part of HL & P's easement. The Perrys' claim lacks serious merit.
 
 
 52
 Any claim for a breach of warranty of title arises from Friendswood's conveyance of the property to Greiner. As Greiner's assignees, the Perrys' rights are derivative of whatever rights Greiner possessed at the time Greiner acquired the property. Houchins v. Scheltz, 590 S.W.2d 745, 751 (Tex.Civ.App.--Houston, no writ). When the grantor and grantee execute a deed and place the deed in escrow, equitable title immediately passes to the grantee. Cowden v. Broderick & Calvert, 131 Tex. 434, 114 S.W.2d 1166, 1169 (1938); Hudgins v. Krawetz, 558 S.W.2d 131, 134, (Tex.Civ.App.--San Antonio 1977, no writ). Legal title passes to the grantee when the loan is paid and the deed is taken out of escrow. Cowden, 114 S.W.2d at 1169. The legal title a grantee receives relates back to the date the grantee received equitable title. Id.
 
 
 53
 At the time Friendswood conveyed the property to Greiner, no encroachment existed. It arose only after Greiner poured the concrete slab. Shortly thereafter, when the loan was paid and the deed taken out of escrow, legal title passed to Greiner. Greiner had legal title to the property, as a result of the relation-back doctrine, before the encroachment was created. An action for a breach of warranty of title therefore does not lie against Friendswood, since Friendswood was not the legal title holder at the time Greiner constructed the encroachment. This result is consistent with the common-sense recognition that the Perrys, who stand in the shoes of Greiner, the original grantee, should not be allowed to enforce against Friendswood, the grantor, a covenant against encumbrances where the encumbrance was created by the original grantee.
 
 
 54
 In their remaining warranty claim, the Perrys argue that Friendswood's advertising literature warranted that Friendswood would conduct a "construction inspection ... prior to [the] pouring of the slab and foundation ... for the purpose of verifying adherence to the established minimum construction standards." The Perrys argue that this statement by Friendswood warranted that Friendswood would physically inspect the property to ensure that, among other things, the slab would be poured in the correct location. The uncontradicted evidence at trial demonstrated conclusively that this statement in the advertising literature merely meant that Friendswood would inspect the premises to ensure that a builder was complying with certain subdivision requirements, such as minimum set-back restrictions, minimum square footage restrictions, and home design restrictions. The quoted statement warranted to potential lot purchasers only that Friendswood monitored the aesthetic consistency and integrity of the homes in the subdivision and in no way warranted to purchasers that Friendswood guaranteed that a builder did not encroach upon existing and properly recorded underground utility easements on his, the builder's, own property. The district court correctly granted Friendswood's motion for a directed verdict on this claim.
 
 E. Truth In Lending Act Violations
 
 55
 The Perrys also claim error in the district court's directing a verdict against them for Hammond's alleged violations of the Federal Truth In Lending Act (TILA), 15 U.S.C. Secs. 1601-1667 (1982), and Regulation Z of the Federal Reserve Board, 12 C.F.R. Secs. 226.4, 226.6 & 226.8 (1984). The Perrys complain of six errors or omissions in the loan disclosure statement prepared by Hammond. We have carefully examined each of the Perrys' TILA claims and have determined that none has merit. For example, the Perrys claim that Hammond violated section 226.6(d) of Regulation Z by failing to disclose on the statement that FNMA was a creditor. At the time Hammond made the loan and completed the statement, however, FNMA was not a creditor; Hammond had no obligation to sell the loan to FNMA; FNMA had no obligation to purchase the loan from Hammond; and Hammond, in fact, did not know whether FNMA would purchase the loan from it. FNMA, therefore, was not a creditor within the meaning of Regulation Z. 12 C.F.R. Secs. 226.2(17) & 226.6(d). In another claimed violation of the TILA, the Perrys allege that Hammond collected $509.33 in prepaid interest charges but disclosed on the statement that only $476.47 was charged. The record reveals that Stewart rather than Hammond collected the prepaid interest and that Stewart refunded the Perrys the $32.86 it overcharged. We have considered the Perrys' remaining four TILA claims. They similarly fall short of having merit.
 
 
 56
 F. The Perry's Motions for Judgments N.O.V.
 
 
 57
 In their final claim, the Perrys challenge the district court's denial of their motions for judgments n.o.v. on claims against Greiner and Stewart for alleged violations of the Texas Deceptive Trade Practices Act, Tex.Bus. & Com.Code Ann. Secs. 17.41-17.63 (Vernon Supp.1985), and against Hammond for alleged violations of the Truth in Lending Act. The Perrys, however, never moved for directed verdicts on these claims. A motion for a directed verdict is prerequisite to a motion for a judgment n.o.v. See Fed.R.Civ.P. 50(b); Perricone v. Kansas City Southern Ry., 704 F.2d 1376, 1380 (5th Cir.1983); see also 5A J. Moore, Moore's Federal Practice p 50.08, at 50-85 (2d ed. 1984); 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2537, at 596 (1971); cf. Merwine v. Board of Trustees for State Institutions of Higher Learning, 754 F.2d 631, 634 (5th Cir.1985) (defendant's motion for a directed verdict at the close of the plaintiff's case satisfies requirements of Rule 50(b)). The district court therefore correctly denied the Perrys' motions for judgments n.o.v.
 
 G. Attorney's Fees for FNMA and Hammond
 
 58
 The remaining issue in this appeal concerns FNMA's and Hammond's cross appeals challenging the district court's denial of their motions for awards of attorney's fees. FNMA and Hammond sought attorney's fees under section 813(a)(3) of the Fair Debt Collection Practices Act, 15 U.S.C. Sec. 1692k(a)(3), and pursuant to a provision in the deed of trust.
 
 
 59
 To recover attorney's fees under the FDCPA, the prevailing defendant must show affirmatively that the plaintiff brought the FDCPA claim in bad faith and for the purpose of harassment. 15 U.S.C. Sec. 1692k(a)(3). Although we do not approve of the Perrys' "everything but the kitchen sink" approach to litigation, we find that the district court did not abuse its discretion in holding that the Perrys were not in bad faith, so an award of attorney's fees against them was not justified.
 
 
 60
 With respect to FNMA's and Hammond's contractual basis for an award of attorney's fees, we conclude that while the district court's discretion was somewhat limited, since the deed of trust authorized an award of attorney's fees, the court exercised that discretion properly. In Cable Marine, Inc. v. M/V Trust Me II, 632 F.2d 1344 (5th Cir.1980), we noted:
 
 
 61
 Where attorney's fees are provided by contract, a trial court does not possess the same degree of equitable discretion to deny such fees that it has when applying a statute allowing for a discretionary award.... Nevertheless, a court in its sound discretion may decline to award attorney's fees authorized by a contractual provision when it believes that such an award would be inequitable and unreasonable.
 
 
 62
 Id. at 1345. See also General Electric Corp. v. Oil Screw Triton, VI, 712 F.2d 991, 995 (5th Cir.1983); Gregg v. U.S. Industries, Inc., 715 F.2d 1522, 1542 (11th Cir.1983) (following Cable Marine ), cert. denied, --- U.S. ----, 104 S.Ct. 2173, 80 L.Ed.2d 556 (1984). The Perrys alleged substantial claims against FNMA and Hammond for violations of the Federal Fair Debt Collection Practices Act and the Texas Debt Collection Act. Although the Perrys did not prevail ultimately on the FDCPA claim, they raised sufficient questions of fact for the jury on the TDCA claim. Against this factual background, we cannot say that the district court abused its discretion in concluding that an award of attorney's fees in favor of FNMA and Hammond and against the Perrys would be inequitable and unreasonable.
 
 III.
 
 63
 In summary, we conclude that the district court properly granted all but two of the defendants' motions for directed verdicts and judgments n.o.v. and properly denied all the Perrys' motions for judgments n.o.v. The court incorrectly granted Hammond's and FNMA's motions for directed verdicts against the Perrys' claims under the Texas Debt Collection Act. We therefore reverse the district court for a trial on those claims. We affirm the judgment in all other respects.
 
 
 64
 AFFIRMED IN PART, REVERSED AND REMANDED IN PART.
 
 
 
 [1]
 The parties agree that if the prepaid charges alone are reduced from the face amount of the note to arrive at "true" principal, the following formulas should be used to determine both the amount of interest legally allowable and the amount of interest Hammond charged the Perrys
 A. Amount of interest allowable:
 $62,300.00 Face amount of note
 - 1,436.47 Prepaid charges
 -------------
 $60,863.53 True principal
 $60,863.53
 X .00877572 30 year monthly interest factor at 10%
 ----------- annual rate (See Am. Jur.2d Desk Book
 at 431 (1979))
 $534.1212974
 $534.1212974
 X 360.8709677 Term of loan: 360 months, 27 days
 -------------
 $192,748.87 Total amount of principal and interest
 payable for 30 years loan at 10% per annum
 $192,748.87
 - 60,863.53 True principal
 -------------
 $131,885.34 Total interest legally allowable
B. Amount of interest charged under the contract:
 $ 529.55 Amount of the Perrys' monthly principal and
 interest payments
 X 360 Number of monthly payments
 -------------
 190,638.00 Total amount of principal and interest
 payable under the terms of the Hammond-
 Perry note
 $190,638.00
 - 60,863.53 True principal
 -------------
 $129,774.47 Total interest chargeable under the note
C. Amount of additional interest Hammond could have legally charged the Perrys
 after deducting $1436.47 in prepaid charges from the face amount of the note:
 $131,885.34 Total interest legally allowable
 - 129,774.47 Total interest chargeable under the note
 -------------
 $ 2,110.87 Additional interest Hammond could have
 legally charged the Perrys