IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SUNTRUST MORTGAGE INC., | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| CHRISTIANA TRUST, A DIVISION OF | ) | No. 32011-1-III |
| WILMINGTON SAVINGS FUND | ) | |
| SOCIETY, FSB, AS TRUSTEE FOR | ) | |
| STANWICH MORTGAGE LOAN | ) | |
| TRUST, SERIES 2012-13, its successors | ) | |
| in interest and/or assigns, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEVEN M. MILLER and LETICIA | ) | |
| MILLER, individually and the marital | ) | |
| community comprised thereof, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| CITIBANK SOUTH DAKOTA, N.A.; | ) | UNPUBLISHED OPINION |
| OCCUPANTS OF THE PREMISES; and | ) | |
| any persons or parties claiming to have | ) | |
| any right, title, estate, lien or interest in the | ) | |
| real property described in the complaint, | ) | |
| | ) | |
| Defendants, | ) | |

SIDDOWAY, C.J. — Steven and Leticia Miller appeal the trial court's summary

judgment dismissal of counterclaims they asserted in response to this mortgage

foreclosure action initiated against them by SunTrust Mortgage, Inc.[1] The Millers'

counterclaims alleged violations of the federal Fair Debt Collection Practices Act,

(FDCPA) 15 U.S.C. § 1692, and Washington's Consumer Protection Act, chapter 19.86

R.C.W. (CPA), as well as defamation of character and intentional infliction of emotional

distress. The Millers contend that SunTrust failed to honor an alleged obligation to

permanently modify their mortgage loan and reduce their monthly payments to an

estimate it provided in August 2009. They argue that the existence of a genuinely

disputed contract right to that loan modification creates issues of fact for their four

counterclaims.

The federal program under which the Millers sought a modification requires that a

borrower be qualified for the modification that he or she seeks. That requirement was

made clear in SunTrust's communications to the Millers. Because the Millers presented

literally no evidence that they qualified for loan terms different from those that SunTrust

offered and that the Millers refused, the trial court properly granted the motion. We

affirm.

---

[1] While the litigation was pending, SunTrust sold its interest in the loan; the new owner, Christiana Trust, as trustee for Stanwich Mortgage Loan Trust, Series 2012-13, was substituted as plaintiff; and SunTrust was realigned as a third party defendant.

FACTS AND PROCEDURAL BACKGROUND

In October 2008, Steven and Leticia Miller found themselves faced with sizable cost overruns and defective work by a contractor they had hired to build a home on their property located at 13210 South Campbell Road in Rockford. In order to satisfy earlier-incurred costs and complete construction, they borrowed $417,000 from the Bank of Whitman, secured by a deed of trust on the property. SunTrust Mortgage Inc. began servicing the loan in November 2008.

The Millers' initial monthly payments under the note were $2,400.49; with the addition of taxes and insurance required to be paid and held in escrow, their total monthly payment was nearly $3,000. Mr. Miller claims to have had monthly take home pay of only $3,800, so this presented what he would later characterize as "an immediate impossible situation." Clerk's Papers (CP) at 252.

In February 2009, the Secretary of the United States Treasury announced a national loan modification program—the Home Affordable Modification Program, or "HAMP"—funded and authorized by the Troubled Asset Relief Program (TARP) created by the Emergency Economic Stabilization Act of 2008.[2] Under the HAMP, home mortgage loan servicers would be compensated by the Treasury for providing homeowners that were at risk of default with sustainable monthly payments. *See* U.S.

---

[2] Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, 122 Stat. 3765 (codified as 12 U.S.C. §§ 5201-5261).

Dep'ts of Treasury & Hous. & Urban Dev., HAMP Suppl. Directive (SD) 09-01, at 1 (Apr. 6, 2009).[3] Mr. Miller heard about the HAMP, contacted SunTrust, and began working with SunTrust representatives on an application for modification in the spring of 2009.

Under the HAMP's uniform loan modification process, once a mortgage servicer obtains preliminary hardship and income information from a borrower, it may offer a Trial Period Plan (TPP). A TPP identifies a reduced total monthly payment that is the servicer's estimate of the payment to be required under the projected permanent modification agreement. If the borrower accepts the TPP, it must make the estimated monthly payment for three successive months. During that trial period, the servicer is required to further review supporting documentation and confirm the borrower's eligibility. If eligibility is confirmed and the borrower has made the three required TPP payments, the servicer will provide the borrower with a loan modification agreement that sets forth terms of a permanent modification.

Events occurring during the review process can result in no permanent modification being offered or being offered on different payment terms. Among the information the servicer is required to obtain and review to confirm a borrower's

---

[3] Available at
https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd0901.pdf (last visited Feb. 27, 2015).

representations and eligibility are tax returns, the most recent paystubs of an employed

borrower, and a credit report, in order to validate installment debt and other liens. SD 09-

01 at 7, 10. If the initial information or documents provided by a borrower prove to be

incorrect following the offer of the TPP, then the borrower might turn out to be ineligible

or the total monthly payment required under the permanent modification might change

from the initial estimate provided by the TPP.

In addition, the net present value (NPV) of the permanent modification must be

calculated using a standardized test dictated by the Treasury Department. A lender is not

required to offer any permanent modification whose NPV is not equal to or greater than

the NPV of the existing loan. *See* SD 09-01 at 4-5.

In late July 2009, SunTrust sent the Millers a written offer of a TPP that would

lower their monthly payments to an estimated $2,113.31. The Millers accepted by

executing the TPP and made the first payment of the new estimated monthly liability on

August 1. While $2,113.31 was some $800 a month less than their existing payments,

the Millers believed it was still too high a payment to be sustainable, so Mr. Miller

contacted SunTrust and requested a plan under which their payment would be even

lower.

In response to the Millers' request for a lower monthly payment, SunTrust sent the

Millers a written offer of a second TPP in August 2009 that would lower their monthly

payments to an estimated $1,311.87. The Millers accepted by executing this second TPP

on August 24, and they thereafter made the first and second payments of the new estimated monthly liability on or about September 1 and October 1.

On or about October 20, SunTrust sent the Millers a home affordable modification agreement, reflecting the terms on which it was willing to make a permanent modification of their loan. This permanent modification agreement provided for an initial interest rate of 3.625 percent and a new 30-year term ending in 2039. It provided for an initial total monthly payment of $2,084.85, consisting of $1,927.18 in principal and interest and $157.67 as payment to be escrowed to cover tax and insurance. The letter accompanying the agreement stated that in order to accept the offered modification, the Millers must sign and return the agreement by October 27.

On October 22 Mr. Miller called SunTrust to ask why the permanent modification payment was higher than the estimated payment under the second TPP. According to Mr. Miller, a SunTrust representative informed him that the second TPP had been offered to the Millers by "mistake." CP at 255. Mr. Miller would later be told by representatives of SunTrust that the estimated payment of $1,311.87 was "based on a verbal." CP at 258. The Millers did not execute and return the permanent modification agreement. Instead, they continued making monthly payments in the amount of $1,311.87 and Mr. Miller continued to correspond and speak with SunTrust representatives and later, representatives of the Federal Home Loan Mortgage Corporation (Freddie Mac), in an effort to obtain a more affordable modification.

6

Eight months later, in a letter dated June 30, 2010, SunTrust notified the Millers that

> After thoroughly reviewing your financial information and request for payment assistance, we are writing to advise you that SunTrust Mortgage, Inc. is unable to assist you with a loss mitigation workout option at this time. Should your financial circumstances change in the future, or if you decide to sell your property, please immediately contact our Loss Mitigation Department to discuss new opportunities.

CP at 215. The letter provided contact information for SunTrust's Loss Mitigation Department; the HOPE NOW Alliance, which offers HUD[4]-approved counseling; and a HUD-approved credit counselor location service. It concluded by stating that "all collection activity, including foreclosure proceedings, will continue." *Id.*

Mr. Miller then wrote to the office of the president of SunTrust Mortgage, among others, to complain. SunTrust responded with a letter that explained that the Millers had been approved for a loan modification in October 2009, but since the permanent modification was declined, their loan was removed from loss mitigation and the denial letter was sent.

In the meantime, Mr. Miller had received a call at work from Maxine McCluen of SunTrust, who told him she was his "last hope before foreclosure" and encouraged him to re-apply for a modification. CP at 257. Between then and November 22, Ms. McCluen followed up several times, encouraging Mr. Miller to provide the information needed for

---

[4] Department of Housing and Urban Development.

her to process an application. On November 22, 2010, after two aborted offers,[5] Ms. McCluen sent the Millers another proposed permanent modification agreement that required immediate execution and return, along with a check for $2,341.78. She called and spoke with Mr. Miller about it on November 23.

Rather than sign the November agreement, the Millers retained an attorney who wrote to SunTrust and asserted that the servicer was bound by a valid agreement requiring payments of only $1,311.87. SunTrust thereafter served a notice of default and proceeded with this judicial foreclosure action, which it filed in September 2012.

The Millers filed an answer and counterclaims and amended them shortly thereafter. As amended, the Millers' counterclaims alleged violations of the FDCPA, violations of the CPA, defamation, and intentional infliction of emotional distress.

In July 2013, SunTrust moved for summary judgment on all of the Millers' counterclaims. The trial court concluded that the success of the counterclaims depended on the Millers' allegation that the second TPP offered in August gave rise to a contract that was breached—and that no contract *was* breached. It granted the motion. The Millers moved for reconsideration, which was denied. The Millers appeal.

## ANALYSIS

SunTrust argues that we need not reach the issue of whether the second TPP

---

[5] Three offers were sent to the Millers in November, the first two of which described a property in Delaware. SunTrust confirmed that they were in error.

signed by the Millers created a contract because the Millers' claims for relief fail on additional and independent grounds that it raised below. While we conclude that SunTrust's arguments are well-taken, the Millers' briefing strenuously insists that they demonstrated a genuine issue of material fact as to a contract right. We choose to address the contract issue first. We then briefly address SunTrust's additional bases for dismissal.

## I. Contract rights arising under the HAMP procedures

The Millers argue that the TPP they signed in August 2009 resulted in a contract—implicitly, they argue that this second TPP resulted in a contract requiring that SunTrust offer them a permanent loan modification requiring total monthly payments of $1,311.87 a month. A number of cases support the Millers' position that the second TPP resulted in a contract. But they have not identified any authority that supports their position that the August TPP resulted in a contract requiring SunTrust to offer a permanent modification requiring payments of only $1,311.87 a month. Neither the language of the TPP nor the operation of the HAMP supports the Millers' position.

In a leading case addressing the obligations arising under TPPs offered under the HAMP, the Seventh Circuit Court of Appeals surveyed dozens of federal cases in which mortgagors had brought HAMP-related claims. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 559 & n.4 (7th Cir. 2012). While the court noted that a number of courts had dismissed even contract-based claims, it concluded that a contract theory was a viable

basis for a cause of action based on a TPP.

The Treasury Department "strongly encourage[s]" loan servicers to use plans, agreements, and correspondence prepared by the Treasury and requires approval of most variations, so provisions of the TPP used by Wells Fargo in *Wigod* are virtually identical to provisions of the TPP that SunTrust sent to the Millers.[6] SD 09-01 at 15. The *Wigod* court found that provisions of the TPP promised to offer a borrower a permanent loan if two conditions were satisfied: that "(1) [the borrower] complied with the terms of the TPP by making timely payments and disclosures; and (2) [the borrower's] representations remained true and accurate." *Wigod*, 673 F.3d at 560. Equivalent provisions appear in the first full paragraph of the August TPP offered by SunTrust and in its paragraph 3, and state:

> If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.
>
> . . . .
>
> If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan

---

[6] The Treasury-prepared forms are available at www.financialstability.gov. With limited exceptions, servicers choosing to revise the HAMP documents or draft their own documents are required to obtain prior written approval from the Treasury or from the Federal National Mortgage Association (Fannie Mae). SD 09-01 at 15.

Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date.

CP at 187, 189.

The Seventh Circuit recognized, however, that the TPP "allowed the lender to determine the precise contours of the permanent modification at a later date." *Wigod,* 673 F.3d at 564. The August TPP offered by SunTrust likewise provided that "[t]he Trial Period Payment is an estimate of the payment that will be required under the modified loan terms, which will be finalized in accordance with Section 3." CP at 188. This uncertainty was not fatal to the existence of a contract, *Wigod* reasoned, because the HAMP guidelines provided an existing standard by which the ultimate terms of permanent modification would be set. It pointed out that "[i]n its program directives, the Department of the Treasury set forth the exact mechanisms for determining borrower eligibility and for calculating modification terms—namely, the waterfall method and the NPV [net present value] test." *Wigod,* 673 F.3d at 565. "Although the trial terms were just an 'estimate' of the permanent modification terms, the TPP fairly implied that any deviation from them in the permanent offer would also be based on Wells Fargo's application of the established HAMP criteria and formulas." *Id.*

*Corvello v. Wells Fargo Bank, N.A.,* 728 F.3d 878, 883 (9th Cir. 2013), on which the Millers rely, accepted the reasoning of *Wigod* as "sound." It held that "[u]nder Paragraph 2G of the TPP, there could be no actual mortgage modification until all the

11

requirements were met, but the servicer could not unilaterally and without justification refuse to send the offer." *Id.*[7] In *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 232-33 (1st Cir. 2013), the First Circuit Court of Appeals explicitly held that a loan servicer did not breach a contract created by the TPP by offering a permanent loan modification that required higher monthly payments than those required during the trial period.

In moving for summary judgment, SunTrust presented evidence that it had sent the Millers a proposed permanent modification agreement on October 20, 2009, specifying a monthly payment of $2,084.85, which required acceptance by October 27. The permanent modification agreement would have provided the Millers with a $900 reduction, approximately, from their existing monthly payment. SunTrust presented evidence that later, in November 2010, it offered the Millers yet another modification agreement. It presented evidence that neither offer of a loan modification was ever accepted by the Millers.

Summary judgment is appropriate when the moving party shows there is "no

---

[7] Paragraph 2G of SunTrust's August TPP stated in part:

> I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (I) I meet all of the conditions required for modification, (II) I receive a fully executed copy of a Modification Agreement, and (III) the Modification Effective Date has passed.

CP at 189.

12

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). A defendant may move for summary judgment on the ground that the plaintiff lacks competent evidence to support its claim. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). After a party moving for summary judgment submits adequate affidavits, the nonmoving party must set forth specific facts rebutting the moving party's contentions and disclosing that a genuine issue of material fact exists. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 12-13, 721 P.2d 1 (1986).

In the case of a motion for summary judgment asking the court to dismiss a breach of contract claim, it is the burden of the nonmoving party to present specific evidence of a breach in order to be entitled to go to trial on the claim. *Hartford Ins. Co. v. Ohio Cas. Ins. Co.*, 145 Wn. App. 765, 780, 189 P.3d 195 (2008). The evidence presented must be "specific, detailed, and disputed facts; speculation, argumentative assertions, opinions, and conclusory statements will not suffice." *Sanders v. Woods*, 121 Wn. App. 593, 600, 89 P.3d 312 (2004).

The reviewing court "engages in the same inquiry as the trial court when reviewing an order for summary judgment." *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). All facts and inferences will be construed in the light most favorable to the nonmoving party. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45

P.3d 1068 (2002).

Once SunTrust showed that it had offered permanent modification agreements reducing the Millers' monthly payments, it was incumbent upon the Millers to set forth and support specific facts rebutting SunTrust's position that the permanent modification terms it proposed were determined as required by the TPP and the HAMP. Instead, the Millers merely speculated that the terms reflected in the October 2009 and November 2010 offers of permanent modification were noncompliant.

The Millers could have obtained SunTrust's analysis of their loan through discovery, since HAMP servicers are subject to document retention requirements:

> Servicers must retain all documents and information received during the process of determining borrower eligibility, including borrower income verification, total monthly mortgage payment and total monthly gross debt payment calculations . . . (assumptions, inputs and outputs), evidence of each step of the standard waterfall, escrow analysis, escrow advances, and escrow set-up . . . .
>
> Servicers must retain detailed records of borrower solicitations or borrower-initiated inquiries regarding the HAMP, the outcome of the evaluation for modification under the HAMP and specific justification with supporting details if the request for modification . . . was denied.

SD 09-01 at 13-14. Yet the Millers presented no evidence obtained from SunTrust revealing that SunTrust's analysis was flawed or supported a lower permanent monthly payment.

Alternatively, the Millers could have engaged a qualified expert, familiar with the HAMP modification process, to review true and complete information about the Millers'

14

finances and circumstances in order to express an opinion whether SunTrust had arrived at erroneous permanent modification terms. An affidavit from such an expert demonstrating that the payment terms offered by SunTrust were not the terms that should have been arrived at after applying the Treasury-dictated methods would have presented a genuine issue of material fact as to the existence of a contract breach.

The Millers did neither.

The Millers also argued that the October 2009 offer of a permanent modification agreement breached the August TPP because the modification agreement was sent before the date of the last (November 2009) payment required by the August TPP. Yet the Treasury's directives "encourage[d]" loan servicers to "wait to send the Agreement to the borrower for execution until after receipt of the *second to the last payment* under the trial period." SD 09-01 at 15 (emphasis added).

Given the language in the TPP that the trial period payment was an estimate, that a permanent modification would be offered only to eligible borrowers, and the implicit fact that final terms of a modification would depend on SunTrust's verification of information and its calculations under the HAMP program, the Millers' evidence that the August TPP reflected an estimated payment different from the payment required under the permanent modifications offered is no evidence of breach of contract. Given the Millers' failure to present evidence that the permanent terms offered were not the terms for which the Millers were eligible, the trial court properly granted summary judgment.

15

## *II. Other grounds supporting dismissal*

Additional grounds for dismissing the Millers' claims were argued by SunTrust below and are independently sufficient to support the dismissal. In reviewing a trial court's order, an appellate court may consider any argument raised and argued at the trial court, even if the trial court did not consider the argument in reaching its conclusion. *See Alton V. Phillips Co. v. State*, 65 Wn.2d 199, 202, 396 P.2d 537 (1964).

*FDCPA claim.* SunTrust argues that it cannot be held liable under the FDCPA because it is not a debt collector. The FDCPA defines a "debt collector" as any person "who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). The term does not include any person who collects a debt owed or due another to the extent such activity "concerns a debt which was originated by such person," or "concerns a debt which was not in default at the time it was obtained by such person." 15 U.S.C. § 1692a(6)(F)(ii), (iii).

A number of courts have held that the FDCPA's definition of debt collector "does not include the consumer's creditors, a mortgage servicing company, or an assignee of a debt, as long as the debt was not in default at the time it was assigned." *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985); *see also Roth v. CitiMortgage Inc.*, 756 F.3d 178, 183 (2d Cir. 2014). The Ninth Circuit has agreed in an unpublished opinion. *Diessner v. Mortg. Elec. Registration Sys.*, 618 F. Supp. 2d 1184, 1188 (D. Ariz. 2009), *aff'd*, 384 F. App'x 609 (9th Cir. 2010) (unpublished). Washington cases are in accord.

*Walker v. Quality Loan Serv. Corp.*, 176 Wn. App. 294, 315, 308 P.3d 716 (2013) (mortgage servicer companies and others who service outstanding debts for others are not debt collectors so long as the debts were not in default when acquired for servicing).

SunTrust began servicing the Millers' home loan on or about November 24, 2008, and the Millers made full payments through July 2009. Accordingly, no claim under the FDCPA could be asserted against SunTrust.

*Defamation.* The Millers' amended answer and counterclaims alleged that SunTrust "has defamed [the Millers'] name and credit through its credit recovery actions." CP at 103. In order to succeed on a claim of defamation, a party must prove (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages. *Mark v. Seattle Times*, 96 Wn.2d 473, 486, 635 P.2d 1081 (1981). Available defenses include truth and privilege. *Id.* at 482.

The Millers' defamation counterclaim does not specifically identify the date, speaker, or the content of any communication alleged to be false. The only evidence of defamation they offered in opposition to SunTrust's motion to dismiss the defamation claim was included in an unsworn narrative by Mr. Miller, which states in relevant part, "On September 4, 2012, SunTrust filed a lawsuit against us in which it attacked my character by publicly stating that I owed thousands of dollars to CitiBank and Garco

17

Construction from previous judgments against me."[8] CP at 268.

"Allegedly libelous statements, spoken or written by a party or counsel in the course of a judicial proceeding, are absolutely privileged if they are pertinent or material to the redress or relief sought, whether or not the statements are legally sufficient to obtain that relief. The defense of absolute privilege or immunity avoids all liability." *McNeal v. Allen*, 95 Wn.2d 265, 267, 621 P.2d 1285 (1980) (citation omitted) (citing *Gold Seal Chinchillas, Inc. v. State*, 69 Wn.2d 828, 420 P.2d 698 (1966)). The Millers failed to present specific evidence of any potentially actionable defamatory statements.

*Outrage.* In order to succeed on a claim for the tort of outrage (intentional infliction of emotional distress), a party is required to prove (1) extreme and outrageous conduct, (2) the intentional infliction of emotional distress, and (3) the resulting emotional distress is severe. *Kloepfel v. Bokor*, 149 Wn.2d 192, 194-95 & n.1, 66 P.3d 630 (2003). The conduct must be "'*so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.*'" *Dicomes v. State*, 113 Wn.2d 612, 630, 782 P.2d 1002 (1989) (quoting *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291 (1975)). As a matter of law, the Millers did not allege extreme and outrageous conduct.

*CPA claim.* RCW 19.86.020 makes unlawful "[u]nfair methods of competition

---

[8] SunTrust objected to the admission of the unsworn narrative in both its reply to the Millers' response to its motion for summary judgment, as well as at the hearing.

and unfair or deceptive acts or practices in the conduct of any trade or commerce." In order to succeed on a CPA claim, a plaintiff must establish (1) an unfair or deceptive act, (2) in trade or commerce, (3) which affects the public interest, (4) injury to plaintiff in his or her business or property, and (5) a causal link between the unfair or deceptive act complained of and the injury suffered. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986). A CPA claim should be dismissed if any one of these elements is not established. *Sorrel v. Eagle Healthcare*, 110 Wn. App. 290, 298, 38 P.3d 1024 (2002). As additional grounds for dismissing the CPA claim, SunTrust argues that the Millers can present no evidence that would support the third, fourth, and fifth elements of the claim. We address only the public interest element.

In *Hangman Ridge*, the court announced factors to be considered when determining whether the public has an interest in a certain transaction. If the transaction is essentially a consumer transaction the court should consider: "(1) Were the alleged acts committed in the course of defendant's business? (2) Are the acts part of a pattern or generalized course of conduct? (3) Were repeated acts committed prior to the act involving plaintiff? (4) Is there a real and substantial potential for repetition of defendant's conduct after the act involving plaintiff? (5) If the act complained of involved a single transaction, were many consumers affected or likely to be affected by it?" *Hangman Ridge*, 105 Wn.2d at 790.

19

In opposing summary judgment, the Millers argued that "the public interest arises out of SunTrust providing false 1099s to the IRS, lying to the Millers about the modification process, misrepresenting the owner of the loan and not being honest with the investigation into how they handled the loan. . . . [T]he public has a specific interest in having mortgage companies and their servicers be truthful with its clients." CP at 248. But the Millers did not direct the court to the existence of any evidence in support of these alleged acts, let alone to any pattern, repetition or potential for repetition. Again, to avoid summary judgment, a nonmoving party must "set forth specific, detailed, and disputed facts." *Sanders*, 121 Wn. App. at 600. The Millers' opposition was insufficient.

*III. Promissory estoppel; covenant of good faith and fair dealing; attorney fees*

The Millers did not plead, as counterclaims, breach of contract, breach of the covenant of good faith and fair dealing, or promissory estoppel. Acknowledging that these claims were not pleaded, they seek leave from this court to amend their complaint to add claims of promissory estoppel and breach of the covenant of good faith. No such relief is available under the rules on appeal. And *cf.* CR 13(a) (certain counterclaims are compulsory).

The Millers' brief also requests "all reasonable attorney fees and costs as provided by under the law," Brief of Appellant at 15, but without complying with RAP 18.1 or identifying any basis for a fee award. The request is denied.

Affirmed.

20

No. 32011-1-III
Christiana Trust v. Miller

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, J.

21