**David J. KRUTCHKOFF, Plaintiff,**

v.

**FLEET BANK, N.A., Defendant.**

**Civil No. 3:93–119(DJS).**

United States District Court,
D. Connecticut.

Dec. 23, 1996.

Joanne Faulkner, Law Offices of Joanne Faulkner, New Haven, CT, Arthur R. Riccio, Jr., Branford, CT, for David J. Krutchkoff.

Stephen M. Kindseth, Zeisler & Zeisler, P.C., Bridgeport, CT, David S. Hoopes, Mayo, Gilligan & Zito, Wethersfield, CT, for Fleet Bank, N.A.

## MEMORANDUM OPINION AND ORDER

SQUATRITO, District Judge.

Plaintiff David J. Krutchkoff ("Krutchkoff") brings this action alleging violations of the Consumer Credit Protection Act ("CCPA"), 15 U.S.C. §§ 1640, 1666(e), 1691e, and 1693m; as well as Conn. Gen.Stat. §§ 42–100b and 42–110g. On July 25, 1996, this Court granted, absent objection, the Plaintiff's Motion for Summary Judgment as to Count One of the Complaint. Under this Count, Krutchkoff claimed that the Defendant, Fleet Bank, N.A. ("the bank"), violated the CCPA's Fair Credit Billing provision, 15 U.S.C. § 1666(a), when the bank failed to correct a billing error in a timely manner.

The remaining Counts were heard by this Court during a bench trial, over the course of five days. As detailed below, this Court concludes that Krutchkoff has failed to demonstrate, by a preponderance of the evidence, that the bank violated his rights under the Consumer Credit Protection Act, as alleged in Counts Two through Seven of the Complaint. Therefore, the Court rules in favor of the bank with regard to these Counts.

Furthermore, as to the bank's Counterclaim, the Court concludes that the principal amount of $9,236.92, plus interest, remains due and owing on Krutchkoff's Premier Line of Credit Account. Therefore, the Court awards the defendant Fleet Bank the amount due and owing on this account, plus attorney's fees and court costs.

### BACKGROUND

On March 30, 1987, Krutchkoff and his wife (collectively, "the Krutchkoffs") entered into a written agreement for Consumer and Fiduciary Premier Accounts ("Premier Agreement"), with the Connecticut Bank and Trust Company, N.A. ("CBT"); Fleet Bank is CBT's successor in interest. (Def.'s Ex. 1.) Pursuant to the Premier Agreement, the Krutchkoffs opened a CBT Premier Account for personal, family or household use. Created as a single account under one signed agreement, the Premier Account consisted primarily of three segments: Premier Checking; Premier Line of Credit ("LOC"); and a Gold MasterCard. (*Id.* at 2.)

The Premier Agreement established and governed the relationship and procedures for all three segments of the Premier Account, and was structured to promote the transferability of funds between the checking, LOC and credit card account segments. Under the Premier Agreement, the Krutchkoffs received one "monthly Account statement" that detailed their checking, LOC and credit card activity during each billing cycle. (*Id.* at 9.) Also, by selecting the agreement's optional "Automatic Payment Plan Authorization," the Krutchkoffs authorized the bank to: (1) deduct from Premier Checking the amount due on their MasterCard at the end of each billing cycle; (2) deduct from Premier Checking the minimum payment due on their

LOC at the end of each billing cycle; and (3) transfer from Premier Checking to their LOC "extra payments," in accordance with the terms of the agreement. (*Id.* at 11.) Under the agreement, the bank would make these deductions and transfers automatically and at substantially regular intervals. (*Id.*) Furthermore, the Krutchkoffs agreed to "pay at once on [the bank's] demand [their] entire unpaid LOC balance ..." (*Id.* at 4.)

On January 6, 1991, the Federal Deposit Insurance Corporation was appointed receiver of CBT. Six months later, following a period when a temporary "bridge bank," The New Connecticut Bank and Trust Company, N.A. ("New CBT"), carried on the former CBT's business, the Defendant acquired certain assets of the former CBT, including the Krutchkoffs' Premier Account.

## DISCUSSION

### I.  Count One: Billing Error Act

As discussed above, this Court granted, absent objection, Krutchkoff's Motion for Summary Judgment as to Count One of the Complaint. Although the bank subsequently corrected the alleged billing error, the Court concluded that $100 damages were appropriate because the statute imposed strict liability. *See* 15 U.S.C. § 1640 (imposing civil liability for failing to comply with credit billing mandates of CCPA). Furthermore, although this Court concludes that Krutchkoff did not suffer any actual damages as a result of the bank's error, the Court will award costs and attorneys' fees related to Count One, in accordance with 15 U.S.C. § 1640. Plaintiff's attorneys are to submit to this Court an assessment of their reasonable fees incurred for their efforts related specifically to Count One, which this Court decided on July 26, 1992.

### II.  Count Two: Electronic Funds Transfer Act

■ Under Count Two of his Complaint, Krutchkoff argues that the bank violated the Electronic Fund Transfers Act [EFTA], 15 U.S.C. § 1693f, or Reg. E § 205.11, in failing to cancel or refund interest or penalty charges related to the erroneous Futon Factory charge within the EFTA's mandatory time periods for resolving errors.

Krutchkoff asserts that the EFTA protections were triggered when the bank, pursuant to the Premier Agreement: (1) automatically debited his Premier Checking for the amount due on his January 1992 MasterCard statement, which included the incorrect Futon Factory charge; and (2) subsequently credited Krutchkoffs Premier Checking for the erroneous charge. Krutchkoff alleges that the bank violated the EFTA because it did not refund him for interest and fees related to the Futon Factory charge until June 1992, after the statutory time period for resolving errors had expired. *See* 15 U.S.C. § 1693f.

Krutchkoff cannot prevail on this claim because the bank's debits and credits of his Premier Account were not "electronic fund transfers" under the EFTA because they were intra-financial institution transfers. Section 205.3, of Regulation E, identifies certain transfers which, while literally electronic transfers of funds, are not "electronic fund transfers" for purposes of the EFTA. 12 C.F.R. § 205.3(c)(5).

Regulation E provides:

The term electronic fund transfer does not include ... [a]ny transfer of funds under an agreement between a consumer and a financial institution which provides that the institution will initiate individual transfers without a specific request from the consumer: [b]etween a consumer's accounts within the financial institution ... or [b]etween a consumer's account and an account of the financial institution ...

*Id.*

Krutchkoff's claim, in light of the regulations, is inapposite, because Krutchkoff authorized the bank to transfer automatically (without a specific customer request) funds among his Premier Checking, MasterCard and LOC, under the Premier Agreement's optional, "Automatic Payment Plan." Therefore, because the bank made authorized, automatic intra-financial institution transfers within Krutchkoff's Premier Account, pursuant to the Premier Agreement, the EFTA

does not apply. Accordingly, Krutchkoff cannot recover under the EFTA.

## III. Count Three: Equal Credit Opportunity Act

The crux of Krutchkoff's cause of action is in his Third Count. Here, he asserts that Fleet Bank discriminated against him in violation of the Equal Credit Opportunity Act [ECOA], 15 U.S.C. § 1691(a)(3), which provides that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction ... because the applicant has in good faith exercised any right under this chapter."

Krutchkoff asserts that because he reported to the bank an erroneous charge from the Futon Factory that appeared on his Premier Account statement for the billing period ending January 31, 1992, and demanded that the bank correct the error, the bank took retaliatory action against him. In support of his claim, Krutchkoff presents several instances of alleged discriminatory conduct, whereby the bank: (A) denied his April 21, 1992, application for a Visa Gold credit card with a $15,000 credit limit, and instead granted him a standard Visa card with a $5,000 credit limit (Pl.'s Ex. 2); (B) terminated his Premier Line of Credit on June 16, 1992 (J. Ex. 4); and (C) sent him a letter dated September 8, 1992, which incorrectly stated that his home equity line of credit was in arrears (Pl.'s Ex. 9). Based upon a preponderance of the persuasive evidence, this Court finds that Krutchkoff has not proven that the bank discriminated against him or otherwise treated him unfairly.

### A. Visa Application

■ First, Krutchkoff's claim that the bank improperly denied his application for a Visa Gold credit card with a $15,000 credit limit is without merit. The evidence before this Court supports the conclusion that the bank made a good faith assessment of Krutchkoff's debt-income ratio as well as his credit history. For example, the bank demonstrated that Krutchkoff exceeded his $35,-000 CBT Premier Account credit limit approximately fifteen times in nine months (for the period from May 1990 to February 1991). Also, a watched asset report that the bank developed almost a year before Krutchkoff asserted his rights under the CCPA shows that he was a high credit risk because he: failed to provide current financial information; exceeded his credit limit; provided low liquidity and high liability; and was in a deficient collateral position with unsecured debt. (Def.'s Ex. 8 at 4.)

Krutchkoff asserted that the bank acted in bad faith because it failed to consider properly his wife's income when he applied for a credit card. At best, however, any such error was not material to his claim that the bank intended to retaliate against him. This, coupled with the fact that Krutchkoff, when applying for a credit card, refused to provide the bank with the information it requested to verify his income, including his tax returns and other independent information, demonstrates that the bank did not treat Krutchkoff disparately or unfairly.

As a matter of credibility, this Court concludes that the bank acted in good faith, and did not discriminate against Krutchkoff, when it denied his application for a Visa Gold card and granted him, instead, a standard Visa credit card with a $5,000 credit limit.

### B. Cancelled Premier LOC

■ Second, as to the fact the bank terminated his Premier LOC, Krutchkoff testified that this was a personal, discriminatory act against him. His argument is not persuasive. The bank demonstrated that it terminated Krutchkoff's account as part of an objective, business decision to phase out all Premier Accounts it had acquired from the former CBT. The bank also showed that the bank's decision to call due Krutchkoff's LOC was legitimate and made in good-faith, based on credible underwriting data. Therefore, the evidence does not support the claim that the bank unfairly terminated Krutchkoff's account.

Furthermore, Krutchkoff testified repeatedly that the bank closed his account "suddenly" and "without warning," thereby causing him economic, physical and mental injury. These claims are not reflected in the

record. The evidence shows that not only had Krutchkoff consented to an agreement that the bank could call due his line of credit, on demand, at any time (Def.'s Ex. 1 at 10), but also that Krutchkoff knew as early as August 21, 1991—more than five months before he exercised his rights under the CCPA, and ten months before the bank closed his Premier Account—that the bank planned to discontinue all Premier Accounts (Def.'s Ex. 12). In fact, Krutchkoff himself wrote a letter to Mary Davenport, a bank representative, on May 21, 1992, stating that "[a]s soon as this credit [for interest and fees related to the Futon Factory billing error] is posted to my account, I will be pleased to close the account as instructed." (Pl.'s Ex. 3.)

On June 19, 1992, the bank credited Krutchkoff for the costs related to the billing error, and closed his account. This same day, the bank closed all Premier Accounts, which numbered approximately 800. Therefore, because the evidence shows that the bank acted impartially and in good faith, as part of a business decision designed to restructure the business assets it had acquired from the failed bank, CBT, the Court finds that the bank did not close the account in violation of the ECOA. *See* 15 U.S.C. § 1691(a)(3).

The Court also gives full credit to the bank's evidence demonstrating that it advised Krutchkoff to contact the bank to establish a repayment plan for his LOC balance, which Krutchkoff did not do. Also, the evidence showed that when the bank terminated Krutchkoff's Premier Account, there were approximately four Premier Accounts with outstanding LOC balances, for which repayment plans yet had not been developed; all of these accounts were terminated or restructured. Krutchkoff did not attempt to restructure his account or establish a repayment plan for his LOC; therefore, he failed to present adequate evidence to show that the bank treated him disparately when it terminated his LOC.

### C. Home Equity LOC

■ Third, Krutchkoff's claim that the bank attempted to "persecute" him in sending a letter dated September 8, 1992, which incorrectly stated that his home equity line of credit was in arrears, also fails as not being persuasive. Krutchkoff claimed that he was forced to sell his house because of this letter (allegedly because he feared the bank would institute a foreclosure action). Upon further questioning, however, Krutchkoff admitted that he placed his house on the market at least two months before he ever received the bank's September 8th letter. Krutchkoff then revised his argument and stated that the letter forced him to "accelerate" the sale of his house and accept a lower sale price. The credible evidence does not support this claim. For example, Krutchkoff testified that his asking price (before he received the bank's letter) was $240,000; after he received the bank's letter, he accepted an offer to sell his home for $225,000. Krutchkoff did not provide any convincing evidence that the bank's letter caused him to sell his home when he did, or that his home was valued at a price higher than the sale price.

Furthermore, while the bank's September 8, 1992, letter states "Home Equity Account," it references Krutchkoff's LOC account number, not his home equity account number. Krutchkoff himself was aware of this clerical error, and promptly informed the bank, by letter dated September 15, 1992, that the September 8th letter did not refer to his Home Equity line of credit. (Pl.'s Ex. 11.) Additionally, Krutchkoff conceded that he knew his Home Equity account was not in arrears and that he even received from the bank accurate monthly statements, before and after September 8, 1992, confirming that his home equity account was current. Therefore, the evidence does not support Krutchkoff's claims that the bank influenced his decision to sell his house.

### IV. Count Four: "Miscellaneous" Claims

In what he titles "miscellaneous" claims, Krutchkoff alleges that the bank violated multiple, state and federal, consumer protection laws. These claims, which apparently number eight, lack merit, as discussed below.

### A. Retail Credit Transaction: Conn. Gen.Stat. § 42-100c

■ Krutchkoff's first "miscellaneous" claim is that the bank failed to comply with

the procedures of Conn. Gen.Stat. § 42–100c. (Compl.¶ 36.) This statute, however, applies to retail credit transactions and specifically does not apply to transactions, such as Krutchkoff's, which are governed by the Consumer Credit Protection Act. *See* Conn. Gen.Stat. § 42–100. The statute provides: "'retail credit transaction' includes any agreement or transaction for the retail sale of goods or services which are used or bought primarily for personal, family or household purposes, but it does not include transactions covered by chapter 4 of the consumer credit protection act [15 U.S.C. § 1601 *et seq.*]." Conn. Gen. Star. § 42–100b. Therefore, because the Premier LOC was an extension of credit, not a sale of goods or services under § 42–100b, the billing error procedures of § 42–100c do not apply.

### B. Truth in Lending: 15 U.S.C. § 1666

■ In his second claim under Count Four, Krutchkoff asserts that the bank violated § 161, of the Truth in Lending Act, 15 U.S.C. § 1666, because it failed to respond promptly to his September 17th, 1992, letter (J. Ex. 8), regarding his home equity account. (Compl.¶ 37.) In this letter, Krutchkoff notified the bank that it erroneously represented that his home equity account was in arrears and misstated his home equity account number in its letter to Krutchkoff, dated September 8, 1992 (Pl.'s 9). Section 1666 requires the creditor to respond to the obligor and correct or clarify the issue within the statutory time periods. 15 U.S.C. § 1666. This section, however, does not apply in this case. Krutchkoff waived his rights under § 1666, because he ordered, at the conclusion of his billing error notification, "[d]o not contact us again regarding this matter as it is now closed." (J. Ex. 8). Since Krutchkoff demanded that the bank not contact him (or his wife) regarding the home equity account notice of error, he cannot now collect against the bank.

Krutchkoff argued that, in a letter to the bank dated September 18, 1992 (J. Ex. 9), he recanted his mandate that the bank not contact him regarding the erroneous home equity account statement, and thereby obligated the bank to respond under § 1666. This letter, however, does not even mention the home equity account and only discusses the balance due on Krutchkoff's LOC. In a letter dated September 21, 1992, the bank properly responded to Krutchkoff's request for clarification regarding his LOC balance. (Pl.'s Ex. 12). Therefore, because the bank properly heeded and acted upon Krutchkoff's letters, the Court finds that Krutchkoff cannot prevail under § 1666.

### C. Consumer Credit Protection: Conn. Agencies Regs. § 36a–573

Krutchkoff's additional "miscellaneous claims" primarily are based on Regulations of Connecticut State Agencies under the Creditor's Collection Practices Act ("CCPA"). (Compl.¶ 41–42.) For example, in his third "miscellaneous claim," Krutchkoff argues that the bank violated the CCPA because it "refuse[d] to investigate" the disputes regarding Krutchkoff's accounts. (Krutchkoff cites Conn. Agencies Regs. § 36–243c, which was transferred to § 36a–573, in 1995.) This argument fails because a preponderance of the evidence shows that: (1) there was no dispute regarding Krutchkoff's home equity account since the bank's reference to that account merely was a clerical error which Krutchkoff clarified in his September 17th letter, when he instructed the bank not to contact him again regarding this matter; and (2) the bank promptly and thoroughly investigated and clarified any questions regarding Krutchkoff's LOC balance due in its letter dated September 21, 1992, in response to Krutchkoff's request for clarification, dated September 18, 1992.

### D. Creditor Collection Practices: Disclosure Requirements

Krutchkoff's fourth "miscellaneous claim" (Compl.¶ 4.) misstates the requirements of the CCPA, as well as the parallel federal act, the Fair Debt Collection Practices Act ("FDCPA"). Primarily, Krutchkoff alleges that the bank failed to comply with what now are titled Conn. Gen.Stat. § 36a–647, and Conn. Agencies Regs. § 36a–647–6(*l*), of the Creditor's Collection Practices Act ("CCPA"), because the bank's letters to collect the balance due on Krutchkoff's LOC did

not specifically state that: (1) the bank was attempting to collect a debt; and (2) any information obtained would be used for that purpose.

Regulation § 36a–647–6, of the CCPA, provides:

> [a] *creditor* may not use any fraudulent, deceptive, or misleading representation, device or practice in connection with the collection of any debt ... the failure to disclose clearly in all communications made to collect a debt or to obtain information about a consumer debtor that the creditor is attempting to collect a debt and that any information obtained will be used for that purpose [is a violation of this section].

Conn. Agencies Regs. § 36a–647–6(*l*) (emphasis added).

Krutchkoff also implies that he can recover under the parallel, federal, statute and cites federal authority to support his state claim. In so doing, he fails to recognize the critical distinctions between the two laws.

The FDCPA provides that:

> [a] *debt collector* may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt ... the failure to disclose clearly in all communications made to collect a debt or to obtain information about a consumer, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose [is a violation of the Act].

15 U.S.C. § 1692e(11) (emphasis added).

■ Two critical distinctions exist between the federal and state acts. First, while the FDCPA provides for a private cause of action for FDCPA violations, the CCPA does not authorize private causes of action; rather, the CCPA conveys the power to enforce the CCPA upon the State Banking Commission. *Contrast* 15 U.S.C. § 1692k (authorizing private cause of action and imposing civil liability for FDCPA violations), *with* Conn. Gen.Stat. § 36a–647 (granting State Banking Commission power to enforce CCPA) *and* *Little v. World Fin. Network, Inc.,* 1990 WL 516554, *6 (D.Conn.1990) (noting CCPA does not authorize private causes of action for violations by creditors or debt collectors, but

rather, the Banking Commissioner has authority to enforce the Act).

The second notable distinction between the state and federal acts is that the CCPA applies to creditors, whereas the FDCPA applies to debt collectors, and not creditors.

Under the FDCPA:

> [T]he term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principle purpose of which is the collection of any debts, *or* who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due *another* ...

15 U.S.C. § 1692a(6) (emphasis added).

■ The FDCPA explicitly excludes from the definition of "debt collector" any person collecting a debt which was originated by such person. 15 U.S.C. § 1692a(6)(F)(ii). Case law supports the conclusion that the FDCPA cannot be applied to creditors. *See, e.g., Wadlington v. Credit Acceptance Corp.,* 76 F.3d 103 (6th Cir.1996) (stating, "the legislative history of § 1692a(6) does not include the consumer's creditors"); *Perry v. Stewart Title Co.,* 756 F.2d 1197 (5th Cir.1985) (same); *Teng v. Metro. Retail Recovery, Inc.,* 851 F.Supp. 61 (E.D.N.Y.1994) (holding FDCPA may not be applied to creditor); *World Fin.,* 1990 WL 516554 at *3 (concluding, "Congress clearly sought to exclude creditors—that is, those who extend credit and collect their own debts—from the Act's coverage; such persons are, in the words of the Senate Report, 'restrained by the desire to protect their good will.' ") (quotations and citations omitted). *See also,* S.Rep. No. 95–382 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1696–97. Therefore, although the CCPA applies to the creditor bank, the FDCPA does not.

Krutchkoff attempts to contrive a viable claim under the CCPA and/or the FDCPA, but he cannot. While the CCPA applies to the bank, Krutchkoff's creditor, no private cause of action exists under this state act. Also, although the FDCPA does provide a private cause of action for failure to comply with the disclosure requirements, these requirements do not apply to the creditor bank.

### E. Creditor Collection Practices: Representations—Conn. Agencies Regs. § 36a–647–6

█ Krutchkoff's fifth "miscellaneous claim" also lacks merit. He asserts that the bank used "deceptive" information, thereby violating Conn. Agencies Regs. § 36a–647–6, because the bank's June 19, 1992, letter understates the amount due and owing on Krutchkoff's Premier LOC. (Compl.¶ 42.) In light of the factual evidence, the Court must reject Krutchkoff's allegations, because the record shows that this merely was an innocent clerical error, not made knowingly or with the intent to deceive. The Court gives full credit to the evidence showing that Krutchkoff knew that the actual amount due and owing on his LOC on June 19, 1992, was significantly greater than the amount stated in the bank's letter of that date, and that Krutchkoff regarded the bank's clerical error as a "windfall." Moreover, Krutchkoff presents no evidence that he was harmed by the bank's error. Therefore, because the June 19, 1992, letter contains an innocent clerical error regarding the amount due on Krutchkoff's LOC, and Krutchkoff knew that this merely was an oversight on the part of the bank, the Court finds that the bank did not provide Krutchkoff with false or deceptive information in violation of Conn. Agencies Regs. § 36a–647–6.

### F. Consumer Credit Reporting

Krutchkoff's sixth "miscellaneous claim" is that the bank "adversely affected [his] credit" because the bank accessed his credit report "multiple times." (Compl. ¶ 43; see J. Trial Mem. at 46). The evidence, in fact, runs counter to Krutchkoff's contentions that the bank's actions adversely affected his credit reputation. For example, Krutchkoff presented evidence showing that he was able to obtain a credit card without difficulty, with a higher credit limit ($12,000) than the card the bank offered ($5,000 credit limit). Also, Krutchkoff stated that he had "considerable difficulty with the mortgage process" (Trans. at 209) and, because the bank negatively affected his credit rating, he was unable to obtain a mortgage from Prudential. Krutchkoff further testified, however, that (within an apparently reasonable time) he obtained through Mechanics a favorable mortgage rate on his new condominium, which was at least half of a point below the initial rate he received from Prudential. Therefore, the evidence does not support a finding that the bank adversely affected Krutchkoff's credit.

Furthermore, the Court finds that the bank accessed Krutchkoff's reports with "permissible purpose" within the meaning of 15 U.S.C. § 1681b. Section 1681b(3)(A) provides that "permissible purpose" exists when the user (here, the bank): "intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." 15 U.S.C. § 1681b(3)(A). The evidence shows that the bank had permissible purpose when it accessed Krutchkoff's credit reports because the bank intended to use the information to review and collect Krutchkoff's account. Therefore, the Court rejects this claim.

### G. Creditor Collection Practices: Communication of Dispute Conn. Agencies Regs. § 36a–647–6

The seventh "miscellaneous claim" is that the bank reported Krutchkoff's LOC account as a "profit and loss write-off" without reporting that there was a dispute regarding this account, in violation of what now is titled Conn. Agencies Regs. § 36a–647–6 (Krutchkoff cites to the former section, 36–243c–6(I)). (Compl.¶ 47.) Regulation § 36a–647–6(I) prohibits a creditor from "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." Conn. Agencies Regs. § 36a–647–6(I).

However, Krutchkoff's own witness, Laura Kuchta from the Credit Bureau of Connecticut, testified that Krutchkoff's credit reports do indicate that his debt was disputed. (Trial Tr. at 150–161.) In consideration of the preponderance of the factual evidence before this Court, and because Krutchkoff's records demonstrate to potential creditors (and this

Court) that the debt was documented as disputed, the Court finds that Krutchkoff cannot prevail under Conn. Agencies Regs. § 36a–647–6(I).

### H. CUTPA Claims

Under his eighth and final "miscellaneous" claim, Krutchkoff seeks damages under CUTPA and "applicable statutes." (Compl.¶ 49.) Krutchkoff seeks to recover for "ascertainable loss, including emotional distress, anxiety, outrage, financial inconvenience, loss of credit or damage to his credit reputation." He cannot recover under this claim, however, because Krutchkoff has failed to establish that the bank violated his rights or caused the "ascertainable loss" from which Krutchkoff claims he suffers.

### V. Count Five: Breach of Contract, Obligation of Good Faith

Krutchkoff alleges in Count Five that the bank breached its contract with him by: abruptly terminating his account relationships; demanding full payment of his LOC; and allegedly violating federal and state law, as Krutchkoff states in his other counts. Because the Court finds that the bank acted in good faith and pursuant to non-discriminatory underwriting standards when it closed Krutchkoff's Premier Account and called due his LOC demand obligation on June 19, 1992, and did not otherwise violate Krutchkoff's rights under the contract, Krutchkoff cannot prevail on this Count.

### VI. Count Six: Truth in Lending, Open End Credit

In Count Six, Krutchkoff alleges that the bank violated 15 U.S.C. § 1637(d)(2), and Regulation Z, 12 C.F.R. § 226.9(e), and acted "contrary to its own notice," when it improperly charged him a $40 annual membership fee on a Visa credit card on May 9, 1993. (Pl.'s Ex. 20.)

Regulation Z provides that, "a card issuer that imposes any annual or other periodic fee to renew a credit or charge card account ... shall mail or deliver written notice of the renewal to the cardholder ..." 12 C.F.R. § 226.9(e). This written notice must include, among other things, "how and when the cardholder may terminate credit availability under the account to avoid paying the renewal fee." *Id.* § 226.9(e)(1)(ii).

Apparently, and Krutchkoff does not allege otherwise, the bank properly provided such notice. Krutchkoff, however, claims that although he notified the bank that the annual fee was improper, the bank nonetheless billed him for the fee. Krutchkoff fails to show that the bank's actions fall within the purview of the statute. The bank admits that it inadvertently charged Krutchkoff an annual fee when no fee was due. The evidence shows, however, that this charge was a harmless, clerical error, and upon learning that the fee was improper, the bank timely credited Krutchkoff's account. Therefore, because the evidence shows that the bank acted in good faith and properly corrected the error within a reasonable time, Krutchkoff cannot prevail on this claim.

### VII. Truth in Lending, Closed End Credit

Krutchkoff further asserts that the bank failed to provide the requisite disclosures mandated by the Truth in Lending Act ("TLA"), thereby violating 15 U.S.C. § 1638, when the defendant created account number 7767 1000 0900 1039, in Krutchkoff's name in June or July 1992. This claim lacks merit because the TLA does not apply to the above-referenced account.

The TLA requires a creditor to make certain disclosures "[f]or each consumer credit transaction other than an open end consumer plan." 15 U.S.C. § 1638(a). Under the TLA, the term "credit" means, "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(e).

The TLA does not apply to account number 7767 1000 0900 1039, because the bank did not extend any credit to Krutchkoff related to this account. Krutchkoff was fully aware that the account merely was a repository for the remainder due on his former Premier LOC—an amount which he refused to pay. Nonetheless, he now tries to classify the account as an extension of credit, in the form of a "closed end credit account," with "a $0 credit limit."

Because the bank already had called due Krutchkoff's full LOC balance on June 19, 1992, the full record shows that both parties were aware that the bank neither extended credit nor deferred the balance due under this account number. This is notwithstanding the account statements the bank sent to Krutchkoff in connection with this account (Def.'s Ex. 19), which stated a minimum amount due of $100, because the preponderance of evidence shows that: the bank already called due on demand the entire amount of his LOC balance; Krutchkoff never made any payments under this account; and the parties never established a means of deferred payment for the amount due and owing on Krutchkoff's LOC. Therefore, Krutchkoff's claims that the TLA applies to this account must fail.

### VIII. The Bank's Counterclaim

The bank established, by a preponderance of the evidence, that Krutchkoff owes the principle remaining from his Premier LOC, $9,236.92, plus interest, and that it did not waive its right to collect the outstanding balance. The bank's letter of June 19, 1992, wherein it understated the amount Krutchkoff knew he owed on his LOC, was an innocent clerical error, made without knowledge and in good faith.

The evidence reveals that Krutchkoff, at all times, was fully aware that the June 19, 1992, letter indicated an amount significantly less than the amount due and owing on his Premier LOC. In fact, Krutchkoff's testimony reveals that he was aware, both before and after he received the bank's letter, that his account balance was approximately $25,225, at the start of the billing cycle which included June 19, 1992. Also, Krutchkoff testified that he was "pleased" when he saw that the bank's letter understated the amount he knew was due on his Premier LOC. Further, the facts show that Krutchkoff only benefitted, and was not injured, by the circumstances that delayed his payment in full of the debt that he incurred on his Premier LOC.

Therefore, the Court awards Fleet Bank $9,236.92, plus interest, attorney's fees and court costs. The parties have stipulated to the amount of $13,876.68, which includes principal, interest through April 16, 1996, and attorney's fees. (Stip.Ex. 2.) Additionally, Fleet Bank is to collect interest from April 17, 1996, through the date of this judgment, at a *per diem* rate of $2.37, as the parties established is due under the Premier Agreement. Added to this amount are the remaining attorney's fees due under the Counterclaim, and court costs. (After the date of this judgment, the federal rate of interest will, of course, apply.)

### CONCLUSION

In accordance with this Court's order of July 26, 1996, granting partial summary judgment as to Count One, this Court awards the plaintiff costs and attorney's fees as to Count One only. Furthermore, this Court dismisses the plaintiff's remaining claims. As to the bank's Counterclaim, as stated above, this Court awards the bank the stipulated amount of $13,876.68. Additionally, Fleet Bank is to collect interest from April 17, 1996, through the date of this judgment, at a *per diem* rate of $2.37, plus the remaining attorney's fees under the Counterclaim, and court costs. After the date of this judgment, interest on the judgment will be calculated at the federal rate of interest.

Thereby, the Clerk forthwith shall enter judgment for the defendant on all Counts, except Count One, and judgment for the defendant on the Counterclaim. Thereafter, parties can submit to the Court claims for their respective fees.

It is so ORDERED.