Barbara H. **STEIN**, Plaintiff,

v.

**JP MORGAN CHASE BANK & Chase Manhattan Bank USA, N.A.,** Defendants.

No. 02 CIV. 4484(DC).

United States District Court, S.D. New York.

Aug. 27, 2003.

Beatie & Osborn LLP By: Russel H. Beatie, Esq., Curt D. Marshall, Esq., New York, NY, for Plaintiff.

JP Morgan Chase Legal Department By: Andrew N. Keen, Esq., New York, NY, Burke, Warren, MacKay & Serritella, P.C. By: LeAnn Pederson Pope, Esq., Stephen R. Meinertzhagen, Esq., Chicago, IL, for Defendants.

### MEMORANDUM DECISION

CHIN, District Judge.

In this putative class action, plaintiff Barbara Stein claims that the charges and disclosures in connection with a No Closing Costs Home Equity Line of Credit ("Credit Account") issued by defendants JP Morgan Chase Bank ("JP Morgan") violate the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and the New York State Consumer Protection from Deceptive Acts and Practices Act. N.Y. Gen. Bus. Law § 349 (McKinney 2003). Stein believed that the daily periodic rate and annual percentage interest rate charged for any advances on her Credit Account would be determined as of the date the advance was made; in actuality, the rates were determined as of the date she applied for the account. Defendants' failure to disclose this information, Stein asserts, is deceptive and misleading and violates TILA. Stein asserts these claims against

both JP Morgan and Chase Manhattan Bank USA, N.A. ("CUSA").

Defendants move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted or, in the alternative, pursuant to Fed.R.Civ.P. 12(e) for a more definite statement. Defendants also move to dismiss as to defendant CUSA for lack of standing. In her opposition, Stein requests leave to file a third amended complaint, should the second amended complaint be dismissed for failure to assert the violation of specific provisions of TILA. For the reasons set forth below, the motion to dismiss is granted pursuant to Fed.R.Civ.P. 12(b)(6) on the grounds that the second amended complaint fails to state a claim. Thus, I do not address defendants' other arguments, and plaintiff's request to file a third amended complaint is moot.

## BACKGROUND

### A. *Facts*

On August 29, 2001, Stein applied for a Credit Account issued by The Chase Manhattan Bank ("Chase Manhattan"), now known as JP Morgan. (Second Am. Compl. ¶¶ 26, 28–29). On October 25, 2001, Stein's application was approved at "Prime minus 1.250% for 6 months and Prime plus .750% thereafter," with a $100,000 line of credit. (*Id.* ¶ 28 (internal quotations omitted)). The parties executed a New York Home Equity Line of Credit Agreement and Disclosure Statement (the "Credit Agreement") on October 30, 2001, and a Chase Manhattan representative gave Stein a book of credit checks and informed her that the Credit Account would be opened that day. (*Id.* ¶¶ 28–29, 34 & Ex. A). The Credit Agreement set forth the terms of the Credit Account, including a description of the type of account, when and how it could be accessed, and the method used for calcu-

lating 1) finance charges, 2) the daily periodic rate, and 3) the annual percentage interest rate. (*Id.* Ex. A ¶¶ 1, 2, 7).

The first billing statement for Stein's Credit Account was dated November 11, 2001. (*Id.* ¶ 37). The statement reflected Stein's first credit advances, which were charged on November 7, 2001, and the annual percentage interest rate applied to those advances was 5.250 percent. (*Id.*). Stein's husband wrote a letter to the Chase Mortgage Corporation complaining that 5.250 percent was incorrect. (*Id.* ¶ 38). He asserted that on the date the advances were charged—November 7, 2001—the prime rate was 5.0 percent, the Credit Account provided for a rate 1.25 percent below the prime rate, and therefore the applicable rate should have been 3.75 percent. (*Id.*).

According to Stein's second billing statement, dated December 12, 2001, her account was charged an annual percentage interest rate of 5.250 percent for November 12, 2001 through November 30, 2001, while a rate of 3.75 percent was charged from December 1, 2001 through December 12, 2001. (*Id.* ¶ 39). Stein's husband again corresponded with Chase Manhattan by letter dated December 20, 2001, in which he enclosed payment but deemed it "[p]aid in protest" because of Chase Manhattan's failure to address the error in the interest rate charged. (*Id.* ¶ 40).

After a third letter of complaint from Stein's husband, dated February 7, 2002, a representative of the Chase Mortgage Corporation responded by letter dated April 1, 2002:

> The initial rate charge [sic] to your account is listed in Section 7 (second paragraph) of your contract (this is also the page you forwarded to this office) as 5.250%. This rate was determined by taking the "Prime Lending Rate" at the

time your application was registered with Chase (August 29, 2001) of 6.50% minus the margin of 1.25%. This initial rate was effective from November 2, 2001, though [sic] November 30, 2001. The interest rate changed on December 1, 2001, to 3.75%.

(*Id.* ¶¶ 41–42).

Prior to receiving this letter, Stein was not aware that the annual percentage interest rate was determined as of the date the "application was registered with Chase (August 29, 2001)." (*Id.* ¶¶ 36, 42–43). Rather, plaintiff believed that the critical date for determining the annual percentage interest rate was the date on which advances were made. (*Id.*).

Paragraph seven of the Credit Agreement, however, describes the calculation of the relevant rates:

The daily periodic rate and its corresponding *ANNUAL PERCENTAGE RATE* on the date your Credit Account was opened ("Initial Rate") are *.01438* Daily Periodic Rate and *5.250* corresponding *ANNUAL PERCENTAGE RATE.* The *ANNUAL PERCENTAGE RATE* does not include costs other than interest. Until the first day of the 7th full calendar month beginning after the day your Credit Account is opened, we will calculate your daily periodic rate and your corresponding *ANNUAL PERCENTAGE RATE* in a manner that is discounted and is different from the way we will calculate the daily periodic rate and corresponding *ANNUAL PERCENTAGE RATE* during the rest of the life of your Credit Account. The Daily Periodic Rate and its corresponding *ANNUAL PERCENTAGE RATE* which would have been in effect, if the discounted manner of calculating your rate were not in effect ("Indexed Rate"), are *.01986* % Daily Periodic Rate and *7.250*

corresponding *ANNUAL PERCENTAGE RATE.*

The daily periodic rate (and corresponding *ANNUAL PERCENTAGE RATE* ) are variable rates and therefore may increase or decrease on the first day of each calendar month based on changes in the Prime Rate. "Prime Rate" means the prime rate as published in the "Money Rates" table in *The Wall Street Journal.* We will use the highest Prime Rate if more than one is published.

. . . .

If the daily periodic rate changes, it will be increased or decreased on the first day of each calendar month using the Prime Rate in effect on the preceding business day. Until the first day of the 7th full calendar month beginning after the day your Credit Account was opened, we will determine your daily periodic rate by subtracting 1.250 percentage points from the Prime Rate and dividing the result by 365 (366 in leap years). We refer to this subtraction as the "Introductory Rate Margin." Beginning on the first day of the 7th full calendar month beginning after the day your Credit Account was opened, we will determine your daily periodic rate by adding .750 percentage points to the Prime Rate and dividing the result by 365 (366 in leap years). We refer to this addition as the "Standard Rate Margin."

(*Id.* Ex. A ¶ 7). In other words, paragraph seven provides for a variable rate, changing on the first day of each month, based on the prime rate—less 1.250% for the first six months, and plus 0.750% thereafter. Paragraph seven also specifically states that the "Initial Rate" would be 5.250% annually-precisely the first rate Stein was charged.

Additionally, defendants overcharged Stein in one billing statement by miscalculating the number of days of interest,

based on an erroneous number of days of use and accrual. (*Id.* ¶ 44).

## B. *Applicable Rates*

■ The Court takes judicial notice of the prime rates published in the Wall Street Journal for the dates in question:

| Relevant Dates | Prime Rate |
|---|---|
| Application Date: August 29, 2001 | 6.50% |
| Approval Date: October 25, 2001 | 5.50% |
| First Advances: November 7, 2001 | 5.00% |
| Month End: November 30, 2001 | 5.00% |

*See Money Rates,* Wall St. J., Aug. 30, 2001, at C11; *Money Rates,* Wall St. J., Oct. 26, 2001, at C14; *Money Rates,* Wall St. J., Nov. 8, 2001, at C15; *Money Rates,* Wall St. J., Dec. 3, 2001, at C14; Fed. R.Evid. 201.

## C. *Procedural History*

Stein filed the complaint in this action on June 13, 2002. On August 30, 2002, Stein filed an amended complaint, followed by a second amended complaint on October 15, 2002. Defendants move to dismiss the second amended complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted or, in the alternative, pursuant to Fed. R.Civ.P. 12(e) for a more definite statement. Defendants also move to dismiss the second amended complaint as to defendant CUSA for lack of standing.[1] In her opposition, Stein requests leave to file a third amended complaint if the second

amended complaint is dismissed for failure to specify which sections of TILA were violated.

## DISCUSSION

### A. *Applicable Law*

#### 1. *Motion to Dismiss Standard*

On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir. 1996). The issue is not whether the plaintiff will ultimately prevail, but whether it is entitled to offer evidence to support its claim. *Id.* Dismissal is not warranted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Cooper v. Parsky,* 140 F.3d 433 (2d Cir.1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

#### 2. *TILA*[2]

■ TILA is designed to provide information to consumers who are applying for credit plans. The purpose of TILA is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit

---

**1.** The relationship, if any, between CUSA and JP Morgan is unclear. Plaintiff alleges that she entered into the Credit Agreement with JP Morgan, but she is bringing claims against both defendants, and the second amended complaint contains general references to "defendants," without differentiating between CUSA and JP Morgan. Defendants do not clarify the nature of the relationship between CUSA and JP Morgan, but merely assert that the Credit Agreement was between Stein and JP Morgan, not CUSA, and proceed to point out that Stein fails to allege the two entities are related. (Defs.' Mem. at 4). Because I

dismiss the second amended complaint for failure to state a claim pursuant to Fed. R.Civ.P. 12(b)(6) and do not reach defendant's argument as to standing, I do not need to distinguish between the two parties and treat CUSA and JP Morgan collectively for purposes of this motion.

**2.** TILA is part of Title I of the Consumer Credit Protection Act, and is implemented by Regulation Z, issued by the Board of Governors of the Federal Reserve System. 12 C.F.R. § 226.1 (2003).

terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a); *see, e.g., Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 568, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980) (*"Meaningful* disclosure does not mean *more* disclosure. Rather, it describes a balance between competing considerations of complete disclosure ... and the need to avoid ... [informational overload]." (internal quotations omitted)); *Pechinski v. Astoria Fed. Savs. & Loan Ass'n,* 238 F.Supp.2d 640, 642 (S.D.N.Y.2003). TILA is a remedial statute that, in accordance with Congressional intent, is liberally construed in favor of consumers. *Pechinski,* 238 F.Supp.2d at 642 (citing *N.C. Freed Co. v. Bd. of Governors of the Fed. Reserve Sys.,* 473 F.2d 1210, 1214 (2d Cir.1973)).

> Under TILA, an open end credit plan is defined as a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance. A credit plan which is an open end credit plan within the meaning of the preceding sentence is an open end credit plan even if credit information is verified from time to time.

15 U.S.C. § 1602(i).[3] TILA requires certain disclosures for open end consumer credit plans in general, and more specifically for those that are secured by a consumer's principal dwelling and "provide[ ] for variable rates of interest on credit extended under the plan." *Id.* § 1637a(2). Among the required disclosures are:

> (A) a description of the manner in which such [variable rates of interest] will be computed and a statement that such rate does not include costs other than interest;
>
> (B) a description of the manner in which any changes in the annual percentage rate will be made, including—
>
>> (i) any negative amortization and interest rate carryover;
>>
>> (ii) the timing of any such changes;
>>
>> (iii) any index or margin to which such changes in the rate are related; and
>>
>> (iv) a source of information about any such index....

*Id.*

## B. *Application*

### 1. *TILA Claim*

I conclude that Stein has failed to state a claim upon which relief can be granted. Read in the light most favorable to the plaintiff, the second amended complaint fails to allege a violation of TILA. Accordingly, the second amended complaint is dismissed pursuant to Fed.R.Civ.P. 12(b)(6). Because I am dismissing the second amended complaint for failure to state a claim, I decline to address defendants' argument that Stein lacks standing as to CUSA; I need not reach the portion of defendants' motion requesting a more definite statement; and plaintiff's request to amend the second amended complaint in the event I dismiss it for failure to assert the violation of specific provisions of TILA is moot.

---

**3.** The parties agree that the Credit Account is an open end credit plan to which 15 U.S.C. §§ 1637 and 1637a apply. (*See* Defs.' Mem. at 5 ("As an open-end credit plan, only Sections 1637 and 1637a of TILA even apply to the Credit Agreement."); Pl.'s Opp'n at 8 ("Stein has presented enough facts to put defendants on notice of the events and circumstances of her claim sufficient for defendants to determine that Sections 1637 and 1637a of TILA are applicable. Indeed, TILA applies to open-ended home equity lines of credit like plaintiff's.")).

■ Stein asserts that defendants violated TILA by not disclosing that the annual percentage interest rate was initially determined as of the date she applied for the Credit Account, which was August 29, 2001. (Second Am. Compl. ¶¶ 35–36, 42–43, 46). Admittedly, there is some ambiguity. The Credit Agreement refers to the rate "on the date [the] Credit Account was opened," and arguably the Credit Account was "opened" on the date of approval-October 25, 2001. (*Id.* ¶ 28 & Ex. A ¶ 7). Indeed, by then the prime rate had dropped one percentage point, from 6.50% to 5.50%. If the rate on the approval date had been used, Stein would have paid a full percentage point less than she was actually charged for the Initial Rate.

Stein's argument, however, is rejected, for any arguable ambiguity is eliminated by the Credit Agreement's specific disclosure that Stein would be charged an Initial Rate of 5.250%. (*See id.* Ex. A ¶ 7). In other words, defendants told Stein that she would be charged an Initial Rate of 5.250%, and in fact that was what she was charged initially. Hence, as required by TILA, the Credit Agreement set forth the applicable annual percentage interest rate and the method by which it is calculated, along with the other terms of the Credit Account. (*Id.*).

The Credit Agreement set the "daily periodic rate and its corresponding *ANNUAL PERCENTAGE RATE* on the date [the] Credit Account was opened" at "*.01438 %* Daily Periodic Rate and *5.250 %* corresponding *ANNUAL PERCENTAGE RATE*" and described the method by which the rates would be determined:

Until the first day of the 7th full calendar month beginning after the day [the] Credit Account was opened, we will determine your daily periodic rate by subtracting 1.250 percentage points from the Prime Rate and dividing the result by 365 ... Beginning on first day of the 7th full calendar month beginning after the day [the] Credit Account was opened, we will determine your daily periodic rate by adding .750 percentage points to the Prime Rate and dividing the result by 365 (366 in leap years).

(*Id.*).

For the first billing period, Stein was indeed charged the Initial Rate of 5.250%, as she had been told. For the second billing statement, Stein was charged the Initial Rate of 5.250% for the period from November 12, 2001 through November 30, 2001, and she was charged the adjusted rate of 3.75% for the period from December 1, 2001 through December 12, 2001. (*See id.* ¶¶ 37, 39).

The adjustment was in accordance with the Credit Agreement. The Initial Rate still applied to the last eighteen days of November, as any adjustment in rates occurred "on the first day of each calendar month," and because the prime rate on November 30, 2001 was only 5.00%— "the Prime Rate in effect on the preceding business day"—the rate was reduced to 3.75% on December 1, 2001. (*Id.* Ex. A ¶ 7).

■ The purpose of TILA is to provide the consumer with information that promotes the informed use of credit and allows comparison of credit terms and rates. 15 U.S.C. § 1601(a). "TILA requires meaningful disclosure, meaning a balance between complete disclosure and information overload. Such a balance does not require disclosure of all terms of potential interest." *Hale v. MBNA Am. Bank, N.A.,* No. 99 Civ. 8831(AGS), 2000 WL 1346812, at *6 (S.D.N.Y. Sept.18, 2000) (holding failure to disclose information about treatment of credit balances not violative of TILA). Because the Credit Agreement accomplishes this objective

with its various disclosures,[4] defendants' alleged failure to disclose that the Credit Account is deemed open as of the application date does not constitute a TILA violation. *Cf. Schuster v. Citibank (S.Dakota), N.A.*, No. 00 Civ. 5940(LMM), 2002 WL 31654984, at *3 (S.D.N.Y. Nov.21, 2002) (finding TILA violation for not disclosing that periodic rate may vary); *see, e.g., Schnall v. Marine Midland Bank*, 225 F.3d 263, 269–70 (2d Cir.2000) (failing to disclose periodic rates applicable to promotional offer in promotion letter did not violate TILA); *Miller v. European Am. Bank*, 921 F.Supp. 1162, 1166 (S.D.N.Y. 1996) ("Terms and conditions affecting the use of [free gifts] do not fall within the TILA's regulatory scheme."); *Rothenberg v. Chem. Bank N.Y. Trust Co.*, 400 F.Supp. 1299, 1302–03 (S.D.N.Y.1975) (disclosing method of "determining the balance upon which a finance charge would be imposed" but not "the particular terms of the individual transactions" did not constitute TILA violation).

■ Despite the disclosures in the Credit Agreement, Stein erroneously believed that the interest rates were determined as of the date advances were made on the account. (Second Am. Compl. ¶ 36). The Credit Agreement clearly provided, however, that the finance charges, not the interest rates, "beg[a]n to accrue on the day an Advance [wa]s charged to [the] Credit Account" and set the interest rates as of "the date [the] Credit Account was opened." (*Id.* Ex. A ¶ 7). Stein's confusion between the finance charges and interest rates therefore does not appear to be a result of defendants' alleged lack of disclosure, but rather stems from a misunderstanding of the terms of the Credit Agreement.

■ Finally, Stein alleges that defendants overcharged her on one of her billing statements by miscalculating the amount of interest owed. (*Id.* ¶ 44). *See, e.g., Krutchkoff v. Fleet Bank, N.A.*, 960 F.Supp. 541, (D.Conn.1996) (charging improper annual fee not violation of TILA because bank acted in good faith). This allegation, without more, does not constitute a violation of TILA. The miscalculation of interest does not rise to the level of a TILA violation and therefore fails to state a claim on which relief can be granted. *See generally* 15 U.S.C. §§ 1637, 1637a (setting forth disclosure requirements for open end credit plans under TILA).

### 2. *State Law Claim*

When, as here, the federal claims in a case are dismissed, leaving only state law claims, it is within the discretion of the district court to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *Purgess v. Sharrock*, 33 F.3d 134, 138–39 (2d Cir.1994). I decline to do so here. Stein's state law claim for violation of the New York State Consumer Protection from Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law § 349, is dismissed without prejudice; plaintiff may pursue her state law claim in state court.

### *CONCLUSION*

For the reasons set forth above, defendants' motion to dismiss for failure to state a claim is granted. The complaint is dismissed, with prejudice as to the federal

---

4. In addition to the annual percentage interest rate and the method by which it is calculated, the Credit Agreement, in accordance with TILA, also discloses, *inter alia*, a description of changes in the annual percentage interest rate, such as the timing of the changes and the index or margin on which the changes are based, and statements regarding maximum rates that may be imposed. (*Id.* Ex. A ¶ 7). *See* 15 U.S.C. § 1637a(2).

**294**

claim and without prejudice as to the state law claim.

The Clerk of Court shall enter judgment accordingly.

SO ORDERED.